[Civ. No. 25220.   First Dist., Div. One.   May 12, 1969.]

MONTGOMERY WARD & CO., INCORPORATED, Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

732

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and E. Clement Shute, Jr., Deputy Attorney General, for Defendant and Appellant.

Kent, Brookes & Anderson, Valentine Brookes, Paul E. Anderson, Charles S. Franklin and Irwin J. Shapiro for Plaintiff and Respondent.

SIMS, J.—The State Board of Equalization, which is charged with the administration of the California Sales and Use Tax Law (Rev. & Tax. Code, div. 2, pt. 1, §§ 6001-7176, particularly §§ 7051-7057, and see § 20) has appealed from a judgment which awarded plaintiff retailer a refund of $21,251.61 with interest, representing payment made in satisfaction of an assessment for use taxes which it is claimed the retailer should have collected for the State of California during the period from April 1, 1957 to January 1, 1961 on sales of goods delivered on credit at its Klamath Falls, Oregon, and Reno, Nevada stores to customers who hold charge accounts bearing an address in California.

The parties stipulated to the facts concerning the sales, and the nature of the business activities conducted by plaintiff in California, in Klamath Falls, and in Reno, respectively. These facts are alluded to as they bear upon the various contentions of the parties.

In support of the judgment the retailer contends that the exaction levied, whether a tax or a debt (see Rev. & Tax. Code, §§ 6203 and 6204;[1] and *Bank of America* v. *State Board of Equalization* (1962) 209 Cal.App.2d 780, 799-802 [26 Cal.Rptr. 348]), violates the interstate commerce clause (art. I, § 8, cl. 3) and the guarantees of due process of law, and equal protection of the laws of the Fourteenth Amendment of the United States Constitution; and also was unauthorized under the California Constitution (art. I, § 11) and the California Sales and Use Tax Law. From the stipulated facts, the trial court made findings of ultimate fact and conclusions of law which support each of the retailer's theories. The board attacks all of the conclusions of the trial

---

[1]Prior to August 1, 1965 (Stats. 1965, First Ex. Sess., 1965, ch. 2, § 12, p. 5448, which amended the section in matters not material to this litigation) section 6203 read as follows: ''Every retailer *engaged in* business in this State and making sales of tangible personal property for storage, use, or other consumption in this State, not exempted under Chapter 4 of this part, shall, at the time of making the sales or, if the storage, use, or other consumption of the tangible personal property is not taxable hereunder, at the time the storage, use, or other consumption becomes taxable, collect the tax from the purchaser and give to the purchaser a receipt therefor in the manner and form prescribed by the board.

'' 'Retailer engaged in business in this State' as used in this and the preceding section means and includes any of the following:

''(a) Any retailer maintaining, occupying or using, permanently or temporarily, directly or indirectly, or through a subsidiary, or agent, by whatever name called, an office, place of distribution, sales or sample room or place, warehouse or storage place or other place of business.

''(b) Any retailer having any representative, agent, salesman, canvasser or solicitor operating in this State under the authority of the retailer or its subsidiary for the purpose of selling, delivering, or the taking of orders for any tangible personal property.'' (Italics added.) (Stats. 1957, ch. 807, § 2, p. 2019.) The 1957 amendment effective September 11, 1957 substituted the emphasized language for the phrase ''maintaining a place of,'' and added the second paragraph. (Cf. Stats. 1941, ch. 36, § 1, p. 538.) No point has been made concerning the effect of this change on the levies in question.

Prior to November 13, 1968 (Stats. 1968, ch. 501, § 2, p. 1144, which added a provision to capture any amount unreturned to the customer which is not a tax but was collected from the customer under the representation it was a tax), section 6204 read as follows: ''The tax required to be collected by the retailer constitutes a debt owed by the retailer to this State.'' (Stats. 1937, ch. 683, § 3, p. 1938.)

All further references are to sections of the Revenue and Taxation Code, unless otherwise noted.

court, and contends that the levy is authorized and directed by the applicable statutory provisions, and is constitutionally permissible.

██ ''Since the issues here involve the applicability of taxing statutes to uncontradicted facts, we are confronted purely with a question of law and are not bound by the findings of the trial court [footnotes and citations omitted].'' (*Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 381 [47 Cal.Rptr. 848]. See also *Western Contracting Corp.* v. *State Board of Equalization* (1968) 265 Cal.App.2d 568, 575 [71 Cal.Rptr. 472]; *Standard Register Co.* v. *Franchise Tax Board* (1968) 259 Cal. App.2d 125, 129-130 [66 Cal.Rptr. 803]; *Bank of America* v. *State Board of Equalization, supra,* 209 Cal.App.2d 780, 793.) It is determined from such a review that although the Use Tax Law purports to burden the retailer with the questioned exaction, in doing so it offends existing constitutional principles. The judgment awarding the refund must be affirmed.

### Statutory Provisions

The California use tax is an excise tax ''on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer . . . for storage, use, or other consumption in this State. . . .'' (§ 6201.) ''Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. His liability is not extinguished until the tax has been paid to this State except that a receipt from a retailer *engaged in* business in this State or from a retailer who is authorized by the board, under such rules and regulations as it may prescribe, to collect the tax and who is, for the purposes of this part relating to the use tax, regarded as a retailer *engaged in* business in this State, given to the purchaser pursuant to Section 6203, is sufficient to relieve the purchaser from further liability for the tax to which the receipt refers.'' (§ 6202 (italics added), as amended Stats. 1957, ch. 807, § 1, p. 2019; cf. Stats. 1941, ch. 36, § 1, p. 538; and see § 6203, fn. 1, *supra.*)

Section 6203 (fn. 1, *supra*), which lies at the heart of this controversy, imposes on the retailer the duty to collect the tax; and section 6204 (fn. 1, *supra*) makes the tax required to be collected a debt due to the state. Failure to collect the tax is a misdemeanor (§ 6207). Retailers who sell tangible per-

sonal property for storage, use, or consumption within the state are required to register and give the board such information as it may require (§ 6226; and see §§ 6453, 7053, 7054 and 7055). ". . . for purposes of the use tax a return shall be filed by every *retailer maintaining a place of* business in the State and by every person purchasing tangible personal property, the store, use, storage, use or other consumption of which is subject to the use tax, who has not paid the use tax due to a retailer required to collect the tax. . . ." (§ 6452, as amended Stats. 1946, ch. 567, § 2, p. 1557. The words *"engaged in business in this* State" were not substituted until 1963 by Stats. 1963, ch. 612, § 1, p. 1491.) ". . . For purposes of the use tax, in case of a return filed by a retailer, the return shall show the total sales price of the property sold by him, the storage, use, or consumption of which property became subject to the use tax during the preceding reporting period; . . . [and] the amount of the taxes for the period. . . ." (§ 6453.) The retailer is required to "deliver the return together with a remittance of the amount of the tax due to the office of the board." (§ 6454.) Failure to make a return is a misdemeanor (§ 7151).

"There are exempted from the taxes imposed by this part the gross receipts from the sale of and the storage, use, or other consumption in this State of tangible personal property the gross receipts from the sale of which, or the storage, use, or other consumption of which, this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this State." (§ 6352.) "The storage, use, or other consumption in this State of property, the gross receipts from the sale of which are required to be included in the measure of the sales tax, is exempted from the use tax." ( § 6401, prior to its amendment by Stats. 1965, First Ex. Sess. 1965, ch. 2, § 23, p. 5451 which concerns interests created by a lease.) During the years in question no provision was made for credit or apportionment with respect to retail sales taxes or use taxes paid to another state, political subdivision thereof or the District of Columbia. (Cf. § 6406, as added Stats. 1966, ch. 2, § 4, p. 176, as amended.) There is no provision for compensating the retailer for his services in collecting the tax. (See § 7101.)

The Legislature has adopted presumptions to aid in the proper administration of the Sales and Use Tax Act and to prevent evasion. (See §§ 6091-6095, and 6241-6249.) Section

6241 provides: "For the purpose of the proper administration of this part and to prevent evasion of the use tax and the duty to collect the use tax, it shall be presumed that tangible personal property sold by any person for delivery in this State is sold for storage, use, or other consumption in this State until the contrary is established. The burden of proving the contrary is upon the person who makes the sale unless he takes from the purchaser a certificate to the effect that the property is purchased for resale." Section 6246 provides: "It shall be further presumed that tangible personal property shipped or brought to this State by the purchaser was purchased from a retailer on or after July 1, 1935, for storage, use, or other consumption in this State." Section 6247 provides: "On and after the effective date of this section, it shall be further presumed that tangible personal property delivered outside this State to a purchaser known by the retailer to be a resident of this State was purchased from a retailer for storage, use or other consumption in this State and stored, used or otherwise consumed in this State.

"This presumption may be controverted by a statement in writing, signed by the purchaser or his authorized representative, and retained by the vendor, that the property was purchased for use at a designated point or points outside this State. This presumption may also be controverted by other evidence satisfactory to the board that the property was not purchased for storage, use, or other consumption in this State."

The retailer is an Illinois corporation with its head office and principal place of business in Chicago, Illinois. It conducts a nationwide retail sales business, maintaining places of business in this State and many others, including the states of Oregon and Nevada. It sells its merchandise both by mail order and by direct sale from retail stores which it owns and manages in various towns and cities. For the years involved in this litigation, 1957 through 1960, the retailer had national sales in excess of one billion dollars per year.

It is qualified to conduct intrastate business within the State of California as a foreign corporation, under the authority of sections 6400-6408 of the California Corporations Code. During the period involved it increased its retail stores in California from 17 to 21. It maintained and maintains one of its four regional administrative offices at Oakland, California, for a region which encompasses the stores in Reno and

Klamath Falls. During the four years involved its sales in California rose from $64,300,000 to $85,744,000.

The store in Reno, Nevada, is the retailer's only store in that state. It had sales ranging from $1,871,947 to $2,127,822 during the years in question. The Klamath Falls store is one of 13 stores in Oregon. It had sales ranging from $1,406,446 to $1,631,556 during the same period. Reno, Nevada, is 17 miles from the California border and Klamath Falls, Oregon, is 15 miles from the California border. These communities serve as the principal centers of commerce for the rural areas within a 100-mile radius of each community, including areas in California. Because of the proximity of these commercial centers to the California border some residents of California customarily shop in Reno and Klamath Falls. The retailer's stores located in these commercial centers therefore make sales to California residents.

In addition, Reno is also a major tourist center which draws many California residents, many of whom incidentally shop there. Retailer's stores located in those cities therefore make cash and credit sales to California residents.

When merchandise is delivered from the Reno store, or the Klamath Falls store, into the State of California the retailer collects and remits to California use taxes on those sales. (See § 6241, *supra*.) The propriety of the collection of California use taxes on those sales is not in issue in this action. When delivery is made to the customer at the Reno or Klamath Falls store of merchandise purchased on credit no use tax is collected or remitted even though the credit files of the retailer indicate that the customer has an address in California. The latter sales totaled $509,789 for both stores during the period in question and formed the basis for the board's determination of alleged additional use taxes due. (See § 6481.) Following denial of a petition for redetermination (see §§ 6561-6564), the retailer paid the tax found to be due with interest (see § 6565), and thereafter filed its claim for refund (§ 6902), the denial of which resulted in the present action (§ 6933).

The board contends that since the retailer at all times maintained a place of business in, and was engaged in business in the State of California, it is clearly within the class of retailers obligated to collect and remit the use tax under the provisions of section 6203 (see fn. 1, *supra*). The retailer seeks a narrower construction of the statute, and urges that

before a border store can be deemed to be a retailer as defined by section 6203, it must be shown that the store itself maintained a place of business or engaged in business in California. This construction is too narrow. It is established that under appropriate circumstances, the seller's presence within the taxing state will warrant the imposition of an obligation to collect and remit use taxes on goods sold elsewhere but delivered within the state. (*Scripto* v. *Carson* (1960) 362 U.S. 207, 212 [4 L.Ed.2d 660, 664, 80 S.Ct. 619]; *General Trading Co.* v. *Tax Com.* (1944) 322 U.S. 335, 338 [88 L.Ed. 1309, 1311-1312, 64 S.Ct. 1028]; *Nelson* v. *Montgomery Ward* (1941) 312 U.S. 373, 376 [85 L.Ed. 897, 899, 61 S.Ct. 593]; *Nelson* v. *Sears, Roebuck & Co.* (1941) 312 U.S. 359, 364-366 [85 L.Ed. 888, 892-893, 61 S.Ct. 586, 132 A.L.R. 475]; *Felt & Tarrant Mfg. Co.* v. *Gallagher* (1939) 306 U.S. 62, 66 [83 L.Ed. 488, 491, 59 S.Ct. 376]; *Monamotor Oil Co.* v. *Johnson* (1934) 292 U.S. 86, 95 [78 L.Ed. 1141, 1148, 54 S.Ct. 575]; *People* v. *West Publishing Co.* (1950) 35 Cal.2d 80, 89-92 [216 P.2d 441]; and see *Bank of America* v. *State Board of Equalization, supra,* 209 Cal.App.2d 780, 798-799.) It must be assumed that the Legislature intended to encompass all retailers to the full extent permitted under constitutional principles.

A more perplexing problem is presented by the retailer's contention that the statute (§ 6203) does not provide for the collection of the tax until the storage, use, or other consumption of the property purchased and delivered becomes taxable. The code section reads, "Every retailer . . . shall, at the time of making the sales or, if the storage, use, or other consumption of the tangible personal property is not then taxable hereunder, at the time the storage, use, or other consumption becomes taxable, collect the tax. . . ." The retailer points out that until the purchaser brings the property purchased within the territorial confines of the State of California there is no liability for the tax (§ 6201, and see § 6017), and therefore nothing can be collected at the antecedent sale. In other words, if the property is used, stored or consumed outside of this state, or if it is lost, stolen or destroyed before it is brought within the confines of this state, no liability for a use tax would ever arise. The mere fact credit is extended to a resident of this state has not been, if it could be, made an incident giving rise to an excise tax.

The retailer finds some support for its view in *Chicago Bridge & Iron Co.* v. *Johnson* (1941) 19 Cal.2d 162 [119 P.2d 945] where the court noted, with apparent approval, the

taxing authority's concession that "before a storage, use or other consumption comes within the terms of the act and is thereby taxable, five conditions must be met: (1) The tangible personal property stored or used must be purchased by the storer or user. (2) The purchase must have been made from a retailer. (3) The purchase must have been made on or after July 1, 1935. (4) The property must have been purchased for use or storage in this state. (5) *The property must have been used or stored in this state.*" (19 Cal.2d at p. 167; italics added.)

The same case, however, sets forth the following principles, applicable to any consideration of the scope of the Use Tax Act: "In approaching this problem it is first necessary to consider the purpose and object of the use tax. It cannot be doubted that the purpose sought to be accomplished by a statute relating to taxation is important in construing such statute and in determining the scope of its application. [Citation.] One of these purposes is to make the coverage of the tax complete to the end that the retail sales tax [citation] will not result in an unfair burden being placed upon the local retailer engaged solely in intrastate commerce as compared with the case where the property is purchased for use or storage in California and is used or stored in this state. The two taxes are complemental to each other with the aim of placing the local retailers and their out-of-state competitors on an equal footing. The fundamental principles to be considered in applying such an act are expressed in the case of *Southern Pacific Company* v. *Gallagher,* 306 U.S. 167, 171 . . . as follows: 'The Use Tax Act is complemental to the California Retail Sales Tax Act of 1933. The latter levies a tax upon the gross receipts of California retailers from sales of tangible personal property; the former imposes an excise on the consumer at the same rate for the storage, use or other consumption in the state of such property when purchased from any retailer. As property covered by the sales tax is exempt under the use tax, all tangible personalty sold or utilized in California is taxed once for the support of the state government. . . .' " (*Id.* at pp. 165-166. See also *Union Oil Co.* v. *State Board of Equalization* (1963) 60 Cal.2d 441, 448-450 [34 Cal.Rptr. 872, 386 P.2d 496]; *American Airlines, Inc.* v. *State Board of Equalization* (1963) 216 Cal.App.2d 180, 187-190 [30 Cal.Rptr. 590]; *Bank of America* v. *State Board of Equalization, supra,* 209 Cal.App.2d 780, 791-793.)

The legislative purpose to impose and collect the use tax on property to be stored, used, or consumed in this state is manifested and implemented by the presumptions which have been referred to above. The provisions of section 6247 purport to establish that if the retailer knows that the purchaser is a resident of this state, it then will be presumed that the requisite purpose existed at the time of the purchase and delivery outside of this state, and that the requisite storage, use, or consumption within this state in fact ensued. ■ It is concluded from the foregoing that the Legislature intended insofar as it had power to do so, that the out-of-state retailer should collect the California use tax from purchasers known to be residents of this state at the time of the out-of-state sale.

■ In this case the record does not directly show that the purchasers were residents of this state. The stipulation refers to "customers who held charge accounts, bearing an address in California" and to "customers . . . whose billing address in plaintiff's credit files was a California address." Reference to the form which the retailer requires for an application for credit indicates a request for the applicant's "address" separately from the name and address of his employer. It is acknowledged that cash[2] and credit sales are made from the Reno and Klamath Falls stores to California residents. It may be inferred in the absence of other evidence that each customer with a billing address in California is in fact a customer who resides in California; that the retailer is therefore charged with knowledge of that fact; that each purchase made by such a customer "on credit and delivered outside of California" falls within the type of transaction contemplated by the provisions of sections 6203 and 6247; and that the Legislature intended that the retailer collect a use tax on such sales. The code authorizes the action of the board in redetermining and assessing the tax on those sales. There remains for consideration the validity of the legislation as so administered in the light of established constitutional principles.

---

[2]The stipulated facts reveal that the board does not require the retailer or any of its competitors to collect a California use tax on cash sales made in out-of-state stores to California residents.

In *Scripto* v. *Carson* (1960) 362 U.S. 207, 212 [4 L.Ed.2d 660, 664, 80 S.Ct. 619], the court observed, in commenting on *Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340 [98 L.Ed. 744, 74 S.Ct. 535], ". . . it was impossible for Miller to determine that goods sold for cash to a customer over the counter at its store in Delaware were to be used and enjoyed in Maryland."

*Due Process*

"The due process clause requires 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' (*Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340, 344-345 . . .) The state's action will satisfy the constitutional test 'if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.' (*Wisconsin* v. *J. C. Penney Co.* (1940) 311 U.S. 435, 444 . . .)" (*Union Oil Co.* v. *State Board of Equalization, supra,* 60 Cal.2d 441, 457 [appeal dismissed (1964) 377 U.S. 404 [12 L.Ed.2d 495, 84 S.Ct. 1629]]. See also *People* v. *West Publishing Co., supra,* 35 Cal.2d 80, 91; *National Bellas Hess* v. *Department of Revenue* (1967) 386 U.S. 753, 756 [18 L.Ed.2d 505, 508, 87 S.Ct. 1389]; *American Oil Co.* v. *Neill* (1965) 380 U.S. 451, 458 [14 L.Ed.2d 1, 6, 85 S.Ct. 1130]; *General Motors* v. *Washington* (1964) 377 U.S. 436, 448 [12 L.Ed.2d 430, 439, 84 S.Ct. 1564]; *Scripto* v. *Carson, supra,* 362 U.S. 207, 210-211 [4 L.Ed.2d 660, 663-664]; *General Trading Co.* v. *Tax Com., supra,* 322 U.S. 335, 338 [88 L.Ed. 1309, 1311-1312]; *Nelson* v. *Montgomery Ward, supra,* 312 U.S. 373, 375 [85 L.Ed. 897, 898-899]; *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359, 364 [85 L.Ed. 888, 892]; *Southern Pac. Co.* v. *Gallagher* (1939) 306 U.S. 167, 180-181 [83 L.Ed. 586, 594-595, 59 S.Ct. 389]; *Felt & Tarrant Mfg. Co.* v. *Gallagher, supra,* 306 U.S. 62, 67 [83 L.Ed. 488, 491-492]; *Connecticut General Co.* v. *Johnson* (1938) 303 U.S. 77, 80-81 [82 L.Ed. 673, 677-678, 58 S.Ct. 436]; and *Monamotor Oil Co.* v. *Johnson, supra,* 292 U.S. 86, 95 [78 L.Ed. 1141, 1148].)

In attempting to extract a controlling principle from the existing precedents one enters an area which has been described in similar context as "Fraught with complexities and inconsistencies." (Mr. Justice Goldberg, dissenting in *General Motors* v. *Washington, supra,* 377 U.S. at p. 452 [12 L.Ed.2d at p. 441].) In *Miller Bros. Co.* v. *Maryland, supra,* the author of the prevailing opinion noted, "Despite the increasing frequency with which the question arises, little constructive discussion can be found in responsible commentary as to the grounds on which to rest a state's power to reach extraterritorial transactions or nonresidents with tax liabilities. Our decisions are not always clear as to the

grounds on which a tax is supported, especially where more than one exists; nor are all of our pronouncements during the experimental period of this type of taxation consistent or reconcilable.'' (347 U.S. at p. 344 [98 L.Ed. at p. 748].)

Preliminarily it should be noted that there are two aspects to the exaction involved: First, the right of the State of California to require a resident to pay a use tax to certain out-of-state merchants who also do business in California, if the resident elects to purchase and take delivery of the goods on credit; and second, the right of the State of California to require those merchants to collect a use tax on such sales, or, on failure to do so, to pay the state the amount of the tax.

The right of a state to tax the storage, use, or consumption of tangible personal property brought within the state for any such purpose is not subject to question. (See cases last cited, *passim*, particularly *Union Oil Co.* v. *State Board of Equalization, supra,* 60 Cal.2d at p. 457; *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. at p. 363 [85 L.Ed. at pp. 891-892]; *Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. at pp. 171-172 [83 L.Ed. at pp. 589-590]; and *Felt & Tarrant Mfg. Co.* v. *Gallagher, supra,* 306 U.S. at p. 67 [83 L.Ed. at pp. 491-492]; and also *Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d at pp. 168-169; *Western Contracting Corp.* v. *State Board of Equalization, supra,* 265 Cal.App.2d at pp. 573-574; *American Airlines, Inc.* v. *State Board of Equalization, supra,* 216 Cal.App.2d at p. 190; and *Bank of America* v. *State Board of Equalization, supra,* 209 Cal.App.2d at p. 792.) The relationship between the State of California and the purchaser is established by his residence. (See *National Bellas Hess* v. *Department of Revenue, supra,* 386 U.S. at p. 757, fn. 9 [18 L.Ed.2d at p. 509].) The relationship between the state, the property, and the transaction, is established by the presumption. (See § 6247, *supra.*) Neither the purchaser, nor the retailer on his behalf, can complain that the presumption will apply unless the purchaser gives a valid certificate that the property is purchased for resale (§§ 6241-6243), or a statement that the property was purchased for use at a designated point or points outside this state. One who intends to store, use, or otherwise consume the property within this state has no constitutional right to evade the tax. (See *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359, 366 [85 L.Ed. 888, 893].) Since the purchaser who stores, uses, or otherwise consumes the property in this state is liable for the tax until it is paid (§ 6202), and must make a return and pay the tax if he has

not paid it to a retailer (§§ 6452-6454), he is not prejudiced if he is required to make payment to an agent designated by the state at the time of his purchase under the conditions existing in this case.

■ "The liability of the retailer is not . . . for the use tax itself but for an *amount equivalent* to it because of his default in his duty as collection agent. The taxpayer is the person ultimately liable for the tax itself, and not the person who pays the tax liability. [Citation omitted.] ■ . . . the retailer is merely paying the debt of another when he pays the purchaser's tax, and as such stands in a position analogous to that of a surety for the purchaser so as to entitle him to reimbursement. ■ Accordingly, the liability of the retailer under section 6204, by virtue of its wording and as construed by the cases, is for a debt rather than for taxes." (*Bank of America* v. *State Board of Equalization, supra,* 209 Cal.App.2d at pp. 799-800.) ■ Nevertheless, in appraising the power of a state to impose liability on an out-of-state seller to collect a local use tax, that liability has been equated with the power to tax transactions which are related to out-of-state activities. In *Miller Bros. Co.* v. *Maryland, supra,* the court states: "The practical and legal effect of the Maryland statute as it has been applied to this Delaware vendor is to make the vendor liable for a use tax due from the purchaser. In economic consequence, it is identical with making him pay a sales tax. The liability arises only because of a Delaware sale and is measured by its proceeds. But at the time of the sale, no one is liable for a Maryland use tax. That liability arises only upon importation of the merchandise to the taxing state, an event which occurs after the sale is complete and one as to which the vendor may have no control or even knowledge, at least as to merchandise carried away by the buyer. The consequence is that liability against the Delaware vendor is predicated upon use of the goods in another state and by another person. We do not understand the State to contend that it could lay a use tax upon mere possession of goods in transit by a carrier or vendor upon entering the State, nor do we see how such a tax could be consistent with the Commerce Clause." (347 U.S. at p. 344 [98 L.Ed. at p. 748]. See also *National Bellas Hess* v. *Department of Revenue, supra,* 386 U.S. 753, 756 [18 L.Ed.2d 505, 508].) On the other hand, it has been stated, "We note that the appellant is charged with no tax—save when, as here, he fails or refuses to collect it

from the [taxing state] customer.'' (*Scripto* v. *Carson, supra,* 362 U.S. at p. 211 [4 L.Ed.2d at p. 664].)

The scope of the constitutional principles first referred to is most recently summarized as follows in *National Bellas Hess* v. *Department of Revenue,* as follows: ''In applying these principles the Court has upheld the power of a State to impose liability upon an out-of-state seller to collect a local use tax in a variety of circumstances. Where the sales were arranged by local agents in the taxing State, we have upheld such power. *Felt & Tarrant Co.* v. *Gallagher,* 306 U.S. 62 [83 L.Ed. 488, 59 S.Ct. 376]; *General Trading Co. Tax Com.,* 322 U.S. 335 [88 L.Ed. 1309, 64 S.Ct. 1028]. We have reached the same result where the mail order seller maintained local retail stores. *Nelson* v. *Sears, Roebuck & Co.,* 312 U.S. 359 [85 L.Ed. 888, 61 S.Ct. 586, 132 A.L.R. 475]; *Nelson* v. *Montgomery Ward,* 312 U.S. 373 [85 L.Ed. 897, 61 S.Ct. 593]. In those situations the out-of-state seller was plainly accorded the protection and services of the taxing State. The case in this Court which represents the furthest constitutional reach to date of a State's power to deputize an out-of-state retailer as its collection agent for a use tax is *Scripto, Inc.* v. *Carson,* 362 U.S. 207, [41 L.Ed.2d 660, 80 S.Ct. 619]. There we held that Florida could constitutionally impose upon a Georgia seller the duty of collecting a state use tax upon the sale of goods shipped to customers in Florida. In that case the seller had '10 wholesalers, jobbers, or ''salesmen'' conducting continuous local solicitation in Florida and forwarding the resulting orders from that State to Atlanta for shipment of the ordered goods.' 362 U.S. at 211 [4 L.Ed.2d at 664].

''But the Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail. Indeed, in the *Sears, Roebuck* case the Court sharply differentiated such a situation from one where the seller had local retail outlets, pointing out that 'those other concerns . . . are not receiving benefits from Iowa for which it has the power to exact a price.' 312 U.S. at 365 [85 L.Ed. at 892, 132 A.L.R. 475]. And in *Miller Bros. Co.* v. *Maryland,* 347 U.S. 340 [98 L.Ed. 744, 74 S.Ct. 535], the Court held that Maryland could not constitutionally impose a use tax obligation upon a Delaware seller who had no retail outlets or sales solicitors in Maryland. There the seller advertised its wares to Maryland residents through newspaper and radio advertising, in addition to mailing circulars four times

a year. As a result, it made substantial sales to Maryland customers, and made deliveries to them by its own trucks and drivers." (386 U.S. at pp. 757-758 [18 L.Ed.2d at p. 509].)

The board contends that *Nelson* v. *Sears, Roebuck & Co., supra,* and *Nelson* v. *Montgomery Ward, supra,* are decisive of this case because it is stipulated that the retailer is doing business in this state. Analysis demonstrates the facts of this case do not permit such a ready solution. The decisions reflect that where the tax collecting burden has been imposed on the multi-state operating retailer, it has only been authorized for transactions which have involved delivery within the taxing state, and has not been extended to transactions which are completed extraterritorially. California may not burden a foreign corporation's out-of-state business as a condition of permitting it to do business within the state. The protection afforded and the benefits conferred must have some relationship to the transaction which the state seeks to burden.

In the chain store cases, the Iowa Supreme Court had upheld contentions similar to those advanced by the retailer here. It "held that if respondent had limited its activities to a mail order business of the kind here involved, it would not be doing business in Iowa; that, although technically the tax may be on the purchaser, it must be collected when the sale is made, at which time the property is outside the state; that these sales are separate and distinct from respondent's activities in Iowa. It therefore concluded that the tax as applied was unconstitutional since Iowa has no power to regulate respondent's activities outside the state or to regulate such activities as a condition to respondent's right to continue to do business in the state." (312 U.S. at pp. 362-363, and see pp. 374-375 [85 L.Ed. at pp. 891-892, and see pp. 898-899].) The United States Supreme Court pointed out, "Use in Iowa is what is taxed regardless of the time and place of passing title and regardless of the time the tax is required to be paid." (*Id.* p. 363 [85 L.Ed. at p. 892].) In response to the contention that "there is no local activity by [the retailer] which generates or which relates to the mail orders here involved . . ." the court observed, ". . . these orders are still a part of respondent's Iowa business. The fact that respondent could not be reached for the tax if it were not qualified to do business in Iowa would merely be a result of the 'impotence of state power.' *Wisconsin* v. *J. C. Penney Co., supra.* Since Iowa has extended to it that privilege, Iowa

can exact this burden as a price of enjoying the full benefits flowing from its Iowa business. Cf. *Wisconsin* v. *J. C. Penney Co., supra.* Respondent cannot avoid that burden though its business is departmentalized. Whatever may be the inspiration for these mail orders, however they may be filled, Iowa may rightly assume that· they are not unrelated to respondent's course of business in Iowa. They are nonetheless a part of that business though none of respondent's agents in Iowa actually solicited or placed them. Hence to include them in the global amount of benefits which respondent is receiving from Iowa business is to conform to business facts.'' (*Id.,* p. 364, and see p. 375 [85 L.Ed. at p. 892, and see pp. 898-899].)

The broad language set forth above was applied to uphold the collection of a use tax ''on mail orders sent by Iowa purchasers to [the retailer's] out of state branches and filled by direct shipments through the mails or a common carrier from those branches to the purchasers.'' (*Id.,* p. 362, and see p. 374 [85 L.Ed. at p. 891, and see p. 898].) The question presented in this case of ''the duty . . . to collect the use tax on sales made in retail stores located near, but outside, the boundaries of [the taxing state], where the purchaser was a resident of [the taxing state] and purchased the property for use in [that state]'' was expressly excluded from consideration in those cases. (See 312 U.S. at p. 374, fn. 3 [85 L.Ed. at p. 898].)

In *General Trading Co.* v. *Tax Com., supra,* the collection of use taxes from an out-of-state mail order retailer, on sale of property shipped into the taxing state by mail or common carrier, as the result of orders solicited by salesmen sent into the taxing state from their out-of-state headquarters, was sustained despite the fact that the retailer had never qualified to do business in the taxing state nor did it maintain there any office, branch or warehouse. The opinion of the court ruled: ''We agree with the Iowa Supreme Court that *Felt & Tarrant Co.* v. *Gallagher,* 306 U.S. 62 [83 L.Ed. 488, 59 S.Ct. 376]; *Nelson* v. *Sears, Roebuck & Co., supra;* and *Nelson* v. *Montgomery Ward & Co., supra,* are controlling. The *Gallagher* case is indistinguishable—certainly nothing can turn on the more elaborate arrangements for soliciting orders for an intricate machine for shipment from without a State as in the *Gallagher* case, compared with the apparently simpler needs for soliciting business in this case. And the fact that in the *Sears, Roebuck* and *Montgomery Ward* cases the interstate

vendor also had retail stores in Iowa, whose sales were appropriately subjected to the sales tax, is unconstitutionally irrelevant to the right of Iowa sustained in those cases to exact a use tax from purchasers on mail order goods forwarded into Iowa from without the State. All these differentiations are without constitutional significance.'' (322 U.S. at pp. 337-338 [88 L.Ed. at pp. 1311-1312].)[3, 4] The foregoing appears to render irrelevant the extent to which the retailer conducted business in California that was unrelated to the sales in question.

In *Miller Bros. Co.* v. *Maryland, supra,* the court in a five-to-four decision, ruled that the out-of-state retailer had not subjected itself to the taxing power of the neighboring state, nor had it afforded that state a jurisdiction or power to create a collector's liability. The chain store cases here were distinguished on what previously had been stated to be a ''constitutionally irrelevant'' ground. The court said, ''The decisions relied upon by Maryland do not, in our view, support her.

[3]On the same day the same author filed a second opinion in which the court denied the right of the state of consumption to levy a sales, as distinguished from a use, tax on sales made under similar circumstances. (*McLeod* v. *Dilworth Co.* (1944) 322 U.S. 327 [88 L.Ed. 1304, 64 S.Ct. 1023].) The court stated, ''. . . in this case the Tennessee seller was through selling in Tennessee. We would have to destroy both business and legal notions to deny that under these circumstances the sale—the transfer of ownership—was made in Tennessee. For Arkansas to impose a tax on such transaction would be to project its powers beyond its boundaries and to tax an interstate transaction.'' (322 U.S. at p. 330 [88 L.Ed. at p. 1306].) The retailer contends that the *Dilworth* case precludes the imposition of any burdens by California on sales which are executed and under which the goods are delivered out of the state. (See also *Standard Oil Co.* v. *Johnson* (1944) 24 Cal.2d 40, 45 [147 P.2d 577].) The board, however, conceded that it cannot apply the California sales, as distinguished from use, tax to the transaction in question.

[4]A third opinion filed the same day affirms the unquestioned right of the States of Nevada and Oregon to subject the sales within their respective borders to sales tax even though the purchaser intended from the beginning to remove the goods to his place of residence and that fact may have been known to the seller. (*Harvester Co.* v. *Department of Treasury* (1944) 322 U.S. 340, 345-346 [88 L.Ed. 1313, 1317-1318, 64 S.Ct. 1019], and see the thoughtful and penterating concurring opinion of Mr. Justice Rutledge [concurring also with *General Trading Co.* and dissenting from *Dilworth*] 322 U.S. at p. 349, particularly p. 362 [88 L.Ed. at p. 1319, particularly p. 1326]. See also *Shell Oil Co.* v. *State Board of Equalization* (1966) 64 Cal.2d 713, 724 [51 Cal.Rptr. 524, 414 P.2d 820] [app. dismissed (1967) 386 U.S. 211 [17 L.Ed.2d 870, 87 S.Ct. 973]]; *Utah Tax Com.* v. *Pacific Pipe Co.* (1963) 372 U.S. 605, 606 [10 L.Ed.2d 8, 9, 83 S.Ct. 925]; and *Department of Treasury* v. *Wood Corp.* (1941) 313 U.S. 62, 68 [85 L.Ed. 1188, 1193, 61 S.Ct. 885].) The effect of the existence and exercise of that jurisdiction to tax on the exaction at issue in this case is discussed below.

This is not the case of a merchant entering a state to maintain a branch and engaging in admittedly taxable retail business but trying to allocate some part of his total sales to nontaxable interstate commerce. Under these circumstances, the State has jurisdiction to tax the taxpayer, and all that he can question on Due Process or Commerce Clause grounds is the validity of the allocation. Cf. *Nelson* v. *Montgomery Ward & Co.,* 312 U.S. 373 [85 L.Ed. 897, 61 S.Ct. 593]; *Nelson* v. *Sears, Roebuck & Co.,* 312 U.S. 359 [85 L.Ed. 888, 61 S.Ct. 586, 132 A.L.R. 475]; *Norton Co.* v. *Department of Revenue,* 340 U.S. 534 [95 L.Ed. 517, 71 S.Ct. 377]." (347 U.S. at p. 346 [98 L.Ed. at p. 749].)

In *Scripto* v. *Carson, supra,* the court applied the principles of the *General Trading Co.* case to uphold the imposition of liability for failure to collect a use tax on goods sold and shipped from out-of-state to fill orders secured by independent brokers. The court held that there was no constitutional significance in the fact that those soliciting the orders were independent brokers only expending part of their efforts as agents of the retailer, rather than full time regularly employed salesmen. (362 U.S. at pp. 211-212 [4 L.Ed.2d at pp. 663-664].) No mention was made of the chain store cases.

In *People* v. *West Publishing Co., supra,* this state followed the theory that the chain store cases were predicated on the theory that the mail order sales "could not be divorced from the integrated local activities of the company." (35 Cal.2d at p. 90.) The retailer conceded that it was subject to a duty to collect use taxes on goods delivered into the state on out-of-state sales attributable to the solicitation of its local salesmen, on the basis of the *General Trading Co.* case. Its contention that its mail order sales did not subject it to the duty to collect a use tax on those sales was rejected. The court stated: ". . . appellant in maintaining its 'places of business' in California has enjoyed such protection, opportunities, advantages, and benefits from the state as to bring it within the constitutional application of the Use Tax Act on *all* its sales with reference to an integrated course of business activity, whether the result of direct solicitation of its salesmen operating here or through mail orders as part of its overall California business. [Citations.]" (35 Cal.2d at p. 92.)

Finally, it may be noted in the quotation from *National Bellas Hess, supra,* that the maintenance of local retail stores was considered as the distinguishing factor in the chain store

cases. (386 U.S. at p. 757 [18 L.Ed.2d at p. 509].) In that case the retailer conceded that it was collecting use taxes on mail order sales shipped into states where it maintained retail stores. (*Id.*, fn. 10.)

Of the foregoing cases only *Miller Bros. Co.* involves sales in which delivery was made at the out-of-state store for cash or credit.[5] The out-of-state retailer's activities within the taxing state are set forth as follows: "The grounds advanced by Maryland for holding the Delaware vendor liable come to this: (1) the vendor's advertising with Delaware papers and radio stations, though not especially directed to Maryland inhabitants, reached, and was known to reach, their notice; (2) its occasional sales circulars mailed to all former customers included customers in Maryland; (3) it delivered some purchases to common carriers consigned to Maryland addresses; (4) it delivered other purchases by its own vehicles to Maryland locations. The question is whether these factors, separately or in the aggregate, in each or all of the above types of sales, establish a state's power to impose a duty upon such an out-of-state merchant to collect and remit a purchaser's use tax." (347 U.S. at pp. 341-342 [98 L.Ed. at pp. 746-747].) The court observed, "We are unable to find in any of our cases a precedent for sustaining the liability asserted by Maryland here. In accordance with the principles of earlier cases, it was recently settled that Maryland could not have reached this Delaware vendor with a sales tax on these sales. *McLeod* v. *Dilworth Co.*, 322 U.S. 327. Can she then make the same Delaware sales a basis for imposing on the vendor liability for use taxes due from her own inhabitants? It would be a strange law that would make appellant more vulnerable to liability for another's tax than to a tax on itself." (*Id.*, pp. 345-346 [98 L.Ed. at p. 749].) After distinguishing the chain store cases, as set forth above, the court noted with respect to *General Trading Co., supra,* that "the only non-local phase of the total sale being acceptance of the order." (*Id.*, p. 346 [98 L.Ed. p. 749].) It concluded, ". . . there is a wide gulf between this type of active and aggressive operation

---

[5]According to the stipulated facts, $2,500 of the $12,000 in total sales, for cash and on credit, involved in the four and one-half years under review, represented the sales price of articles taken away from the out-of-state store by the purchasers. Of goods delivered in the taxing state, $8,000 were delivered by the retailer's truck, and $1,500 by common carrier. (See 347 U.S. at pp. 350-352, Appendix to Opinion of the Court, fn. 4, pars. 5 and 6 [98 L.Ed. at pp. 751-752].)

within a taxing state and the occasional delivery of goods sold at an out-of-state store with no solicitation other than the incidental effects of general advertising. Here was no invasion or exploitation of the consumer market in Maryland. On the contrary, these sales resulted from purchasers traveling from Maryland to Delaware to exploit its less tax-burdened selling market. That these inhabitants incurred a liability for the use tax when they used, stored or consumed the goods in Maryland, no one doubts. But the burden of collecting or paying their tax cannot be shifted to a foreign merchant in the absence of some jurisdictional basis not present here." (*Id.,* p. 347 [98 L.Ed. p. 749].)

On the state of the law as outlined above, resolution of the due process question in this case must depend on a determination to extend the principle of the chain store cases to sales made and delivered without the taxing state, as well as to sales made without the state for delivery within the state; or, alternatively, to apply the principle of the *Miller Bros. Co.* case to a multi-state retailer even though it conducts some activities in the state seeking to impose the burden. Before further examining the principles involved it is necessary to consider the facts concerning the retailers' activities within California, and the impact of the activities of the border stores within this state.

The board states, "It would appear to be most naive to suppose that Montgomery Ward's California business activities, including those of its regional headquarters in Oakland, California, were totally unrelated to the activities of the border stores in dealing with California residents." It has failed to point out what intrastate activities contribute to the sales made by the border stores to residents of California. The existence of a regional headquarters in Oakland, with administrative jurisdiction over the border stores, among others, is not determinative. There is nothing to show any particular contribution to the sales in question here. Certainly the existence of this headquarters could not give California the right to tax or impose burdens on all sales in all states throughout the region.

The retailer carries on a continual advertising program throughout the States of California, Oregon and Nevada by use of direct mail, television, radio, newspapers and magazines. The scope of this advertising campaign is commensurate with the number of stores and volume of sales it has in these states. The border stores engage in radio, television and news-

paper advert:.ing through local media which impinge on the neighboring California counties. The retailer's store manual provides for the distribution of circulars by mail within the trading area served by the store. Whenever there is a mailing to credit customers of the respective stores, all credit customers of the stores whose billing address is in California receive direct mail circulars. The content of the advertising which California residents are exposed to and receive is no different than the advertising reaching Oregon and Nevada residents who are also located within the trading areas of the respective stores.

Each of the border stores makes sales in which delivery is made to a California address. On these sales the retailer has collected the California use tax, and in Nevada it has claimed an exemption from the state sales tax. The merchandise so delivered is ordinarily bulky or heavy and not of the sort that can be easily transported from the store by a customer. Appliances, carpets, drapes, and similar articles of merchandise which require installation are delivered in trucks belonging to the retailer or its agents, and are installed by its trained personnel. Salesmen occasionally solicit sales of this type of merchandise within the State of California as a result of invitations to do so from the California residents who make appointments with the salesmen at the stores.

Both stores render warranty service in California on merchandise delivered into California, and on the small percentage, two percent of the sales delivered out-of-state, constituting bulky merchandise, ordinarily delivered, but in fact picked up by the customer. The remaining merchandise delivered out-of-state is ordinarily small, such as dry goods, small appliances, and sports equipment which can be easily transported from the store by customers. Any warranty service on this merchandise would be performed at the store, and the customer would have to return it to obtain service.

The Reno store has used legal process in California to repossess or to collect payment due on merchandise sold and delivered in California. The Klamath Falls store has never used the California courts to collect payment due it. Each store would, if necessary, use the California courts to effect repossession of bulky merchandise, ordinarily delivered, even if it had been taken by the California customer directly from the store. The retailer does not, however, attempt to repossess

the other merchandise delivered at the store through the California courts in the event of a default in payment.

Since there is no relationship between the retailer's general activities in California, and the generation of sales by its border stores, the suggestion that mere presence in California is sufficient to authorize a burden on the out-of-state delivered sales is rejected. The court in *Nelson* v. *Sears, Roebuck & Co., supra,* stated: "Respondent cannot avoid that burden though its business is departmentalized." (312 U.S. at p. 364 [85 L.Ed. at p. 892].) That statement must be read in context. The reference was to the retailer's mail order department insofar as that department dispatched merchandise for delivery in the taxing state. There is no inference that the taxing state could burden all of the business of the mail order department, or all of the business of the retailer in any of the other states of the union because it elected to do an intrastate business in the taxing state. Conversely it may be said that the burdens which the taxing state proposes to impose must have some relationship to the opportunities which that state has given, the protection it has afforded, and the benefits it has conferred. (Cf. *Wisconsin* v. *J. C. Penney Co., supra,* 311 U.S. at p. 444 [85 L.Ed. at p. 270], as cited in *Union Oil Co.* v. *State Board of Equalization, supra,* 60 Cal.2d at p. 457.)

This conclusion is strengthened by the principles set forth in *Connecticut General Co.* v. *Johnson, supra,* 303 U.S. 77 as follows: "As a matter of convenience and certainty, and to secure a practically just operation of the constitutional prohibition, we look to the state power to control the objects of the tax as marking the boundaries of the power to lay it. Hence it is that a state which controls the property and activities within its boundaries of a foreign corporation admitted to do business there may tax them. But the due process clause denies to the state power to tax or regulate the corporation's property and activities elsewhere. [Citations.] It follows that such a tax, otherwise unconstitutional, is not converted into a valid exaction merely because the corporation enjoys outside the state economic benefits from transactions within it, which the state might but does not tax, or because the state might tax the transactions which the corporation carries on outside the state if it were induced to carry them on within." (303 U.S. at pp. 80-81 [82 L.Ed. at pp. 677-678].) In *Wisconsin* v. *J. C. Penney Co., supra,* the *Connecticut General Co.* case was

distinguished as follows: "In the precise circumstances presented by the record it was found that the tax neither in its measure nor in its incidence was related to California transactions. Here, on the contrary, the incidence of the tax as well as its measure is tied to the earnings which the State of Wisconsin has made possible, insofar as government is the prerequisite for the fruits of civilization for which, as Mr. Justice Holmes was fond of saying, we pay taxes." (311 U.S. at p. 446 [85 L.Ed. at p. 271].) So here neither the incidence nor the measure of the burden placed on the retailer is related to the intrastate business which the retailer transacts in California.[6]

A similar selectivity is suggested by *Norton Co.* v. *Department of Revenue* (1951) 340 U.S. 534 [95 L.Ed. 517, 71 S.Ct. 377]. That case involved an occupation tax measured by gross receipts from sales. The court stated, "Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filling, and delivery back to the buyer, it is obvious that the state of the buyer has no local grip on the seller. Unless some local incident occurs sufficient to bring the transaction within its taxing power, the vendor is not taxable. *McLeod* v. *Dilworth Co.*, 322 U.S. 327 [88 L.Ed. 1304, 64 S.Ct. 1023]. Of course, a state imposing a sales or use tax can more easily meet this burden, because the impact of those taxes is on the local buyer or user. Cases involving them are not controlling here, for this tax falls on the vendor. [Fn. citing "Cf. *Nelson* v. *Montgomery Ward & Co.*, 312 U.S. 373 [85 L.Ed. 897, 61 S.Ct. 593]; *Nelson* v. *Sears, Roebuck & Co.*, 312 U.S. 359 [85 L.Ed. 888, 61 S.Ct. 586, 132 A.L.R. 475]; *McGoldrick* v. *Berwind-White Co.*, 309 U.S. 33 [84 L.Ed. 565, 60 S.Ct. 388, 128 A.L.R. 876]; *McLeod* v. *Dilworth Co., supra.*"]

"But when, as here, the corporation has gone into the State to do local business by state permission and has submitted

---

[6]The record reveals that company policy directs the retailer's credit department and selling personnel to promote credit sales in the interests of increasing the overall sales. No opinion is expressed as to the power of a state to impose a tax measured by the credit extended to its residents. The board does not rely on any such tax in these proceedings. In any event, its discriminatory application to credit advanced on out-of-state purchases suggests constitutional infirmities. (Cf. *Wheeling Steel Corp.* v. *Glander* (1949) 337 U.S. 562, 572 [93 L.Ed. 1544, 1551, 69 S.Ct. 1291].)

itself to the taxing power of the State, it can avoid taxation on some Illinois sales only by showing that particular transactions are dissociated from the local business and interstate in nature. The general rule, applicable here, is that a taxpayer claiming immunity from a tax has the burden of establishing his exemption. [Fn. omitted.]'' (340 U.S. at p. 537 [95 L.Ed. at pp. 520-521].) The court upheld the tax as measured by sales made and delivered by the taxpayer's office in the taxing state, and by sales forwarded by that office and delivered f.o.b. out-of-state. As to a third class of sales the court concluded, ''The only items that are so clearly interstate in character that the State could not reasonably attribute their proceeds to the local business are orders sent directly to Worcester by the customer and shipped directly to the customer from Worcester. Income from those we think was not subject to this tax.'' (*Id.*, p. 539 [95 L.Ed. at p. 521].)

The foregoing principles were given vitality in *American Oil Co.* v. *Neill, supra,* 380 U.S. 451. There the court reversed an Idaho excise tax on a dealer licensed to do business in that state insofar as it was measured by sales made by the dealer in Utah for ultimate shipment into Idaho for use in that state. The court ruled, ''The mere fact that Utah Oil knew that the gasoline was to be imported into Idaho merits little discussion. More than once this Court has struck down taxes directly imposed on or resulting from out-of-state sales which were held to be insufficiently related to activities within the taxing State, despite the fact that the vendor knew that the goods were destined for use in that State. *Miller Bros. Co.* v. *Maryland,* 347 U.S. 340 [98 L.Ed. 744, 74 S.Ct. 535] (use tax) ; *Norton Co.* v. *Department of Revenue,* 340 U.S. 534 [95 L.Ed. 517, 71 S.Ct. 377] (gross receipts tax) ; *McLeod* v. *J. E. Dilworth Co.,* 322 U.S. 327 [88 L.Ed. 1304, 64 S.Ct. 1023] (sales tax).

''These cases have also firmly established the doctrine that when a tax is imposed on an out-of-state vendor, 'nexus' between the taxing State and the taxpayer is the outstanding prerequisite on state power to tax. Consistent with this requirement there must be 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' *Miller Bros. Co.* v. *Maryland, supra,* at 344-345. Granted that when a corporation, pursuant to permission given, enters a State and proceeds to do local business the 'link' is strong. In such instances there is a strong inference that it exists between the State and transac-

tions which result in economic benefits obtained from a source within the State's territorial limits. The corporation can, however, exempt itself by a clear showing that there are no in-state activities connected with out-of-state sales. In such instances, the transactions are said to be 'disassociated from the local business,' *Norton Co.* v. *Department of Revenue, supra,* at 537, and therefore may not, consistent with due process, be taxed.'' (380 U.S. at p. 458 [14 L.Ed.2d at p. 6].)

The court observed, ''There is no reason to suppose, nor does the record in any way indicate, that Utah Oil's activities in Idaho contributed in any way to the procurement or per-formances of the contract. . . . Under the circumstances we hold the fact that Utah Oil was the holder of an Idaho deal-er's permit to be purely fortuitous.'' (*Id.,* at pp. 458 and 459 [14 L.Ed.2d at p. 7]. See also *Standard Oil Co.* v. *Johnson* (1944) 24 Cal.2d 40, 46 [147 P.2d 577]; and cf. *Monamotor Oil Co.* v. *Johnson, supra,* 292 U.S. 86, 94-95 [78 L.Ed. 1141, 1147-1148].) So here the fact that the retailer elected to carry on an intrastate business in California is purely fortuitous and does not give this state the right to reach out and tax or otherwise burden transactions which are entirely dissociated from the local business.

The question remains, do the border stores receive such opportunities, protection or benefits from California that California may burden the sales to its residents which are completed outside of its territorial jurisdiction? Comparison of the activities considered in *Miller Bros. Co.* (see 347 U.S. at pp. 341-342 [98 L.Ed. at pp. 746-747] as set forth, *supra*) with the facts related above demonstrate a striking similarity. In each instance there is advertising by radio, television, newspapers and circulars which carries the retailer's sales messages into the taxing state, and in addition there are deliveries of some merchandise into that state. (In *Miller Bros. Co.,* unlike this case, no use tax was collected on the sales represented by such deliveries.)

The board justifiably points out that the degree of such activity is much greater in this case. It also attempts to show, beyond the scope of the stipulation, that the sales efforts in connection with merchandise to be installed within the taxing state, constituted general solicitation. The difference in degree is not constitutionally significant. (Cf. *General Trading Co.* v. *Tax Com., supra,* 322 U.S. 335, 338 [88 L.Ed. 1309, 1311-1312].) This state contributes nothing to the circulation of Reno or Klamath Falls newspapers (cf. the use of advertising

to solicit state sales through media in the taxing state, *Nelson* v. *Montgomery Ward, supra,* 312 U.S. at p. 376 [85 L.Ed. at p. 899]), the use of the United States mails, or the use of the airways by radio or television. (See *Lee Enterprises, Inc.* v. *Iowa State Tax Com.* (1968) —— Iowa ——, —— - —— [162 N.W.2d 730, 740-752].) There was no benefit conferred or privilege which could be withheld. The alleged solicitations were minimum contacts in connection with transactions leading to the delivery of goods in California for which a use tax was collected. It does not appear that those activities had any connection with the out-of-state over-the-counter sales. The use of the California courts has been limited to actions arising out of merchandise delivered in California on which a use tax was paid.

The board also would limit the application of *Miller Bros. Co.* to the situation where the out-of-state retailer has no knowledge of the identity or address of the purchaser, such as is admittedly the case in over-the-counter cash sales by the out-of-state stores. (See *Scripto* v. *Carson, supra,* 362 U.S. 207, 212 [4 L.Ed.2d 660, 664]; *Union Oil Co.* v. *State Board of Equalization, supra,* 60 Cal.2d 441, 458; *Montgomery Ward & Co.* v. *Roddewig* (1941) 228 Iowa 1301, 1302-1303 [292 N.W. 142, 142-143] Hamilton, C. J., dissenting, as referred to in *Nelson* v. *Montgomery Ward, supra,* 312 U.S. 373, 374, fn. 3 [85 L.Ed. 897, 898].) This analysis disregards the fact that about two thirds of the merchandise involved in *Miller Bros. Co.* was delivered in the taxing state by the retailer itself. (See dissent 347 U.S. at p. 358 [98 L.Ed. at pp. 756-757], as quoted below.) If the impact of the border store's activities on California is such as to give California the right to insist on the collection of the use tax on out-of-state, over-the-counter credit sales to known residents, what is to prevent California from requiring the retailer to inquire into all sales, cash or credit, so that there can be no evasion of the tax?

Finally, the board seizes on the sentence in *Miller Bros. Co.* reading, "Here was no invasion or exploitation of the consumer market in Maryland." (347 U.S. at p. 347 [98 L.Ed. at p. 749].) It urges that there was an admitted exploitation of the adjacent California markets because they concededly lay within the trading areas of the respective stores. (See *National Bellas Hess* v. *Department of Revenue, supra,* 386 U.S. 753, 765 [18 L.Ed.2d 505, 513-514], Mr. Justice Fortas, dissenting; and *Scripto* v. *Carson, supra,* 362 U.S. 207, 212 [4

L.Ed.2d 660, 664].) If invasion or exploitation of the market in the manner stipulated to in this case were to govern, California would then be entitled to similarly burden any solely local out-of-state merchant whose activities similarly impinged on California consumers, if jurisdiction of his person could be secured.

The board can find some support in the dissenting opinion in *Miller Bros. Co.* where four members of the court, of whom three are presently sitting, observed: "This is not a case of a minimal contact between a vendor and the collecting State. Appellant did not sell cash-and-carry without knowledge of the destination of the goods; and its delivery truck was not in Maryland upon a casual, nonrecurring visit. Rather there has been a course of conduct in which the appellant has regularly injected advertising into media reaching Maryland consumers and regularly effected deliveries within Maryland by its own delivery trucks and by common carriers. [Fn. omitted.]" (347 U.S. at p. 358 [98 L.Ed. at p. 756].) It is also noted that in *National Bellas Hess,* Mr. Justice Fortas, joined by two of the aforementioned dissenters, stressed the retailer's extension of credit to purchasers in the taxing state (386 U.S. at pp. 761-762 [18 L.Ed.2d at pp. 511-512]) and stated, in dissent, ". . . a mail order house engaged in the business of regularly, systematically, and on a large scale offering merchandise for sale in a State in competition with local retailers, and soliciting deferred-payment credit accounts from the State's residents, is not excused from compliance with the State's use tax obligations by the Commerce Clause or the Due Process Clause of the Constitution." (*Id.,* at pp. 765-766 [18 L.Ed.2d at pp. 513-514].)

▮ It is concluded that existing precedents under the due process clause preclude California from burdening the retailer's Nevada or Oregon business with the collection of use taxes on over-the-counter sales, whether for cash or on credit, to California residents. The foregoing should dispose of the case, but two factors impel a consideration of other principles. In the first place, the vigorous dissent of Mr. Justice Fortas in *National Bellas Hess* suggests that constitutional due process may in the future be satisfied by the mere extension of credit to a purchaser in the taxing state. (Cf. fn. 6, *supra.*) Secondly, the growth of a credit card-computer economy suggests that the burden of accounting for and col-

lecting the use tax, regardless of where the resident of the state in which the merchandise is to be stored, used, or consumed may purchase it, is not substantial. (Cf. in *National Bellas Hess* v. *Department of Revenue, supra,* Mr. Justice Stewart speaking for the court, 386 U.S. at pp. 759, 760 [18 L.Ed.2d at pp. 510, 511], with Mr. Justice Fortas, speaking for the dissenters at p. 766 [18 L.Ed.2d at p. 514].)

## *Commerce Clause*

In *People* v. *West Publishing Co., supra,* the court stated, "There is no violation of the commerce clause involved in the requirement that an out-of-state seller of goods collect a use tax on goods sold for use within the state (*Nelson* v. *Sears, Roebuck & Co.* (1941) 312 U.S. 359 . . . ; *Nelson* v. *Montgomery Ward Co.* (1941) 312 U.S. 373 . . .), even when the seller is engaged exclusively in interstate commerce. (*Felt & Tarrant Mfg. Co.* v. *Gallagher* (1939) 306 U.S. 62 . . . ; *General Trading Co.* v. *State Tax Com.* (1944) *supra,* 322 U.S. 335.) '' (35 Cal.2d at p. 89. See also *Scripto* v. *Carson, supra,* 362 U.S. 207, 212 [4 L.Ed.2d 660, 664].) The foregoing statement stems from general principles which have evolved in relation to the taxation of interstate commerce as affected by the commerce clause. In *Western Live Stock* v. *Bureau of Revenue* (1938) 303 U.S. 250 [82 L.Ed. 823, 58 S.Ct. 546, 115 A.L.R. 944], the court stated: ''It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business. 'Even interstate business must pay its way,' *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U.S. 252, 259 [other citations omitted], and the bare fact that one is carrying on interstate commerce does not relieve him from many forms of state taxation which add to the cost of his business.'' (303 U.S. at p. 254 [82 L.Ed. at p. 827].) In *Henneford* v. *Silas Mason Co.* (1937) 300 U.S. 577 [81 L.Ed. 814, 57 S.Ct. 524], in upholding the use tax of the State of Washington, the court concluded, ''1. The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end'' (300 U.S. at p. 582 [81 L.Ed. at p. 818]) ; and ''2. The tax upon the use after the property is at rest is not so measured or conditioned as to hamper the transactions of interstate commerce or discriminate against them.'' (*Id.,* p. 583 [81 L.Ed. at p. 819]. See also *Union Oil Co.* v. *State Board of Equalization, supra,* 60

Cal.2d 441, 458-459; *Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d 162, 169-175; *American Airlines, Inc.* v. *State Board of Equalization, supra,* 216 Cal.App.2d 180, 187; *General Motors Corp.* v. *Washington, supra,* 377 U.S. 436, 439-442 [12 L.Ed.2d 430, 433-436]; *Norton Co.* v. *Department of Revenue, supra,* 340 U.S. 534, 539 [95 L.Ed. 517, 521-522]; and *McGoldrick* v. *Berwind-White Co.* (1940) 309 U.S. 33, 45-51 [84 L.Ed. 565, 569-573, 60 S.Ct. 388, 128 A.L.R. 876]. Cf. *Halliburton Oil Well Co.* v. *Reily* (1963) 373 U.S. 64, 69-70 [10 L.Ed.2d 202, 206-207, 83 S.Ct. 1201]; *Nippert* v. *City of Richmond* (1946) 327 U.S. 416, 425-426 [90 L.Ed. 760, 765-766, 66 S.Ct. 586, 162 A.L.R. 844]; *Gwin, etc. Inc.* v. *Henneford* (1939) 305 U.S. 434, 438-440 [83 L.Ed. 272, 275-277, 59 S.Ct. 325]; and *Adams Mfg. Co.* v. *Storen* (1938) 304 U.S. 307, 311-314 [82 L.Ed. 1365, 1369-1371, 58 S.Ct. 913, 117 A.L.R. 429].)

*National Bellas Hess, supra,* suggests that "the test whether a particular state exaction is such as to invade the exclusive authority of Congress to regulate trade between the States, and the test for a State's compliance with the requirements of due process in this area are similar." (386 U.S. at p. 756 [18 L.Ed.2d at p. 508]; but cf. Mr. Justice Rutledge concurring in *Harvester Co.* v. *Department of Treasury, supra,* 322 U.S. 340, 352-362 [88 L.Ed. 1313, 1320-1326].) On this hypothesis, the failure of California to have given anything for which it can ask a return would preclude it from burdening any interstate transaction involving a border store. The situation in this case, however, does not readily fit into the pattern of the cases referred to above. The burden which this state seeks to impose is not one directly on interstate sales, but is on intrastate sales in the neighboring states. The effect on interstate commerce is only incidental, not direct.

The collection of the tax by the out-of-state retailer will affect interstate commerce in the sense that residents of California will be discouraged from shopping in the border stores for the sole purpose of saving the California sales tax. As pointed out in connection with "due process," California may properly impose a use tax for that very purpose, and neither the purchaser, nor the retailer on his behalf, can complain because the resident purchaser's opportunity to evade the payment of the use tax is curtailed.

A further burden is imposed, however, because the California use tax as it existed during the years in question failed to

allow any credit for a sales tax properly imposed by the state in which the property was sold and delivered. With respect to the Nevada store the use tax would be added to a two percent Nevada state sales tax, which, as has been demonstrated, properly may be imposed and collected by that state. (See fn. 4, *supra*.) The net result is to create a deterrence to out-of-state purchases by California residents which is predicated upon a discrimination, not on equalization, for the benefit of local merchants.[7]

Separate excise taxes may be measured by the same sales price where they are exacted for different privileges. "The sales tax and the trucking tax are excise and not property taxes. Each is a well-defined privilege tax: one for the privilege of selling tangible personal property at retail and the other for the privilege of using the public highways for hauling services. Though each tax is measured by gross receipts, separate and distinct privileges are involved. The imposition of such taxes therefore presents no problem of double taxation. (Cf. *Douglas Aircraft Co., Inc.* v. *Johnson,* 13 Cal.2d 545, 549 . . .)" (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 648 [335 P.2d 672].) The sales tax and the use tax ostensibly are exacted on different privileges. (Cf., § 6051 with § 6201.) Nevertheless, the validity of a use tax, which is not applied to intrastate sales, depends on its reciprocal relationship to a sales tax when the use tax is applied to transactions, which because of their extraterritorial incidents, are beyond the reach of the sales tax. Therefore, for all practical purposes the sales and use taxes may be considered together as a unitary system.

---

[7]See Report of the Special Subcommittee on State Taxation of the Interstate Commerce of the House Committee on the Judiciary (H.R. Rep. No. 565, 89th Congress, 1st Sess. (1965) pp. 819, 824, and 833-835, pp. 819, 824 and 833-835. See generally for a discussion of the due process and commerce clause problems the following: H.R. Rep. No. 565, *supra*, ch. 20, p. 625, and particularly pp. 626-627; Note (1968) 29 Ohio St. L.J. 520; *The Supreme Court, 1966 Term* (1967) 81 Harv. L.Rev. 69, 213-217; Note (1966) 51 Cornell L.Q. 346; Note (1966) 20 Vanderbilt L.Rev. 192; *Federal Limitations on State Taxation of Interstate Business* (1962) 75 Harv. L.Rev. 953, 994-1000; Kust & Sale, *State Taxation of Interstate Sales* (1960) 46 Va. L.Rev. 1290; *The Supreme Court, 1953 Term* (1954) 68 Harv. L.Rev. 96, 129-132; Note, *Enforcing State Consumption Taxes on Out-of-State Purchases* (1951) 65 Harv. L.Rev. 301; Comment, *General Sales and Use Taxes and the Commerce Clause* (1944) 32 Cal. L.Rev. 281; Note, *Sales and Use Taxes: Collection from Absentee Vendors* (1944) 57 Harv. L.Rev. 1086; Warren & Schlesinger, *Sales and Use Taxes* (1938) 38 Colum. L.Rev. 49; and Traynor, *The California Use Tax* (1936) 24 Cal. L.Rev. 175.)

In *Henneford* v. *Silas Mason Co.* (1937) 300 U.S. 577 [81 L.Ed. 814, 57 S.Ct. 524] the court noted that the Washington law provided for a credit for any sale or use tax to which the property had been subjected under the laws of Washington or some other state. The court observed, ''The contention would be futile that Washington in laying an ownership tax would be doing a wrong to non-residents in allowing a credit for a sales tax already borne by the owner as a result of the same ownership. To contend this would be to deny that a state may develop its scheme of taxation in such a way as to rid its exactions of unnecessary oppression. In the statute in dispute such a scheme has been developed with sedulous regard for every interest affected. Yet a word of caution should be added here to avoid the chance of misconception. We have not meant to imply by anything said in this opinion that allowance of a credit for other taxes paid to Washington made it mandatory that there should be a like allowance for taxes paid to other states. A state, for many purposes, is to be reckoned as a self-contained unit, which may frame its own system of burdens and exemptions without heeding systems elsewhere. If there are limits to that power, there is no need to mark them now. It will be time enough to mark them when a taxpayer paying in the state of origin is compelled to pay again in the state of destination. This statute by its framework avoids that possibility. The offsetting allowance has been conceded, whether the concession was necessary or not, and thus the system has been divested of any semblance of inequality or prejudice. A taxing act is not invalid because its exemptions are more generous than the state would have been free to make them by exerting the full measure of her power.'' (300 U.S. at pp. 586-587 [81 L.Ed. at p. 821].)

In *Southern Pac. Co.* v. *Gallagher, supra,* the court noted, ''Under the Washington statute . . . discrimination against interstate commerce, arising from a second exaction for use after a foreign tax on sale, could not exist as provision was made for a credit against the local tax of any such foreign levy. No such problem arises here by evidence, finding or assignment of error even though the California Act does not have this provision. It will be time enough to resolve that argument 'when a taxpayer paying in the state of origin is compelled to pay again in the state of destination.' '' (306 U.S. at p. 172 [83 L.Ed. at p. 590], fns. omitted.) In the mail

order cases[8] it may be that "there is no ground under which other states could impose a tax on the identical transactions consummated in California [the presumed ultimate storage, use, or consumption of the merchandise], without violating the commerce and due process clauses of the Constitution. [Citations.]" (*Shell Oil Co.* v. *State Board of Equalization, supra,* 64 Cal.2d at p. 725.) The question left open in the two earlier cases does not appear to have been finally resolved.

The retailer relies upon the principle that the foundation of the nondiscriminatory nature of the use tax is the concept that it equalizes the discrimination in favor of interstate commerce which arises when a state imposes a sales tax on intrastate sales. (*Halliburton Oil Well Co.* v. *Reily, supra,* 373 U.S. 64, 70 [10 L.Ed.2d 202, 207]; *Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. 167, 172 [83 L.Ed. 586, 590]; *Henneford* v. *Silas Mason Co., supra,* 300 U.S. 577, 583-584 [81 L.Ed. 814, 819]; *Union Oil Co.* v. *State Board of Equalization, supra,* 60 Cal.2d 441, 448-449; *Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d 162, 165; *American Airlines, Inc.* v. *State Board of Equalization, supra,* 216 Cal.App.2d 180, 187-190; *Bank of America* v. *State Board of Equalization, supra,* 209 Cal.App.2d 780, 791-792.) In the first case cited the court ruled, "The conclusion is inescapable: equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state." (373 U.S. at p. 70 [10 L.Ed.2d at p. 207].) In this case inequality results because the in-state purchaser pays a tax two percent less than the out-of-state purchaser who intends to store, use, or consume within this state the merchandise purchased on credit and delivered at the Nevada border store.

*General Motors* v. *Washington, supra,* does not authorize the collection of a use tax in addition to an out-of-state sales tax so as to create a discrimination in favor of local intrastate

---

[8]*Felt & Tarrant Mfg. Co.* v. *Gallagher, supra,* 306 U.S. 62; *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359; *Nelson* v. *Montgomery Ward, supra,* 312 U.S. 373; *General Trading Co.* v. *Tax Com., supra,* 322 U.S. 335; and *Scripto* v. *Carson, supra,* 362 U.S. 207. In *General Trading Co.,* 322 U.S. at p. 337 [88 L.Ed. at p. 1311], and *Scripto,* 362 U.S. at p. 210 [4 L.Ed.2d at p. 663], it was noted that there were provisions in the respective statutes of Iowa and Florida giving credit for use or sales taxes paid elsewhere. In *Scripto* it was further noted that Florida reimbursed the retailer for its services in collecting the tax. (362 U.S. at p. 212 [4 L.Ed.2d at p. 664]. See also *National Bellas Hess* v. *Department of Revenue, supra,* 386 U.S. 753, 764, fn. 7 [18 L.Ed.2d at p. 513], Fortas, J., dissenting.)

sales. It merely establishes that the local activities subjected the corporation to a tax measured by its local sales. The court concluded, ''Although mere entry into a State does not take from a corporation the right to continue to do an interstate business with tax immunity, it does not follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain that same degree of immunity.'' (377 U.S. at p. 448 [12 L.Ed.2d at p. 439].)

Since there was no sales or use tax in Oregon during the period in question, the retailer relies on the hazard of multiple taxation as constituting a burden on or discrimination against the Oregon sales. In *Gwin, etc. Inc.* v. *Henneford, supra,* the court was concerned with a tax measured by gross receipts from interstate commerce. The court stated, ''The present tax, though nominally local, thus in its practical operation discriminates against interstate commerce, since it imposes upon it, merely because interstate commerce is being done, the risk of a multiple burden to which local commerce is not exposed. [Citations.]'' (305 U.S. at pp. 439-440 [83 L.Ed. at pp. 276-277]. See also *Adams Mfg. Co.* v. *Storen, supra,* 304 U.S. 307, 311-312 [82 L.Ed. 1365, 1396-1370]; and *Southern Pac. Co.* v. *Gallagher, supra,* 306 U.S. 167, 174-175 [83 L.Ed. 586, 591-592].) It is urged that although the California use tax is nominally local, upon the use within this state, as administered to cover the sales in question here, it subjected the sales in Nevada and Oregon to the burden of possible prohibited multiple taxation, regardless of whether the state of sale and delivery actually exercised its prerogative to tax.

Generally, however, the courts have refused to recognize the possibility, as distinguished from the actuality, of multiple taxation. In *General Motors Corp.* v. *Washington, supra,* the court stated, ''A more difficult question might arise from appellant's claim of multiple taxation. *Gwin, White & Prince, Inc.,* v. *Henneford,* 305 U.S. 434, 440 [83 L.Ed. 272, 276, 59 S.Ct. 325] (1939). General Motors claims that some of its products taxed by Washington are manufactured in St. Louis where a license tax, measured by sales before shipment, is levied. See *American Mfg. Co.* v. *St. Louis,* 250 U.S. 459 [63 L.Ed. 1084, 39 S.Ct. 522] (1919). It is also urged that General Motors' Oregon-based activity which concerns Washington sales might afford sufficient incidents for a similar tax

by Oregon. The Court touched upon the problem of multiple taxation in *Northwest Airlines* v. *Minnesota, supra,* [(1944) 322 U.S. 292] at 295, but laid it to one side as 'not now before us.' Thereafter, in *Northwestern States Portland Cement Co.* v. *Minnesota, supra,* [(1959) 358 U.S. 450] at 463, we held that '[i]n this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense.' Appellant has not done this. It has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments by which Washington measures its tax. Cf. *International Harvester Co.* v. *Evatt,* 329 U.S. 416, 421-423 [91 L.Ed. 390, 394, 395, 67 S.Ct. 444] (1947). And further, it has not been shown that Oregon levies any tax on appellant's activity bearing on Washington sales. In such cases we have refrained from passing on the question of 'multiple taxation,' e.g., *Northwestern States Portland Cement Co.* v. *Minnesota, supra,* and we adhere to that position.'' (377 U.S. at pp. 448, 449 [12 L.Ed.2d at pp. 439-440]. See also *Shell Oil Co.* v. *State Board of Equalization, supra,* 64 Cal.2d 713, 726; *Chicago Bridge & Iron Co.* v. *Johnson, supra,* 19 Cal.2d 162, 171; and *American Airlines, Inc.* v. *State Board of Equalization, supra,* 216 Cal.App.2d 180, 193-194. Cf. Rutledge, J. concurring in *Harvester Co.* v. *Department of Treasury, supra,* 322 U.S. 340, 358-362 [88 L.Ed. 1313, 1323-1325].)

▮ On analysis it is concluded that the California purchaser, and the retailer required to collect the tax due from him, can properly object that the use tax as administered violates the commerce clause with respect to the out-of-state sales in Nevada, because the exaction of the tax in conjunction with the Nevada sales tax discriminates in favor of California intrastate commerce, and imposes an unwarranted burden on the right of the retailer to do business on at least an equal basis with California residents. ▮ With respect to Oregon, the failure to show that there is any multiple taxation prevents the purchaser, or the retailer on his behalf, from objecting to the collection of the tax.

▮ The foregoing considerations relate to the imposition of the use tax itself. The retailer further contends that the collection duty interposes a discriminatory burden on its right to conduct intrastate commerce in Nevada, because its local competitors are not required to collect such taxes. A similar confrontation was made and disposed of as follows in the chain store cases: ''Respondent [retailer], however, insists

that the duty of tax collection placed on it constitutes a regulation of and substantial burden upon interstate commerce and results in an impairment of the free flow of such commerce. It points to the fact that in its mail order business it is in competition with out-of-state mail order houses which need not and do not collect the tax on their Iowa sales. But those other concerns are not doing business in the state as foreign corporations. Hence, unlike respondent, they are not receiving benefits from Iowa for which it has the power to exact a price.'' (*Nelson* v. *Sears, Roebuck & Co., supra*, 312 U.S. at p. 365 [85 L.Ed. at p. 892].)

This analogy breaks down, when it is considered that in that case Iowa was the state from which the orders emanated and in which the goods were delivered. In this case California, as has been shown, contributed nothing to the sale but the home residence of the purchaser, and a future haven for the goods he purchased out-of-state. The purchaser's right ''to move freely from state to state is an incident of national citizenship protected by the privileges and immunities clause of the Fourteenth Amendment against state interference.'' (Douglas, J., concurring, *Edwards* v. *California* (1941) 314 U.S. 160 at p. 178 [86 L.Ed. 119 at p. 127, 62 S.Ct. 164].) California cannot, therefore, exact a tribute from the border merchant for permitting its residents to shop out-of-state. The absence of a *quid pro quo* leaves the retailer free to object to the burden of collection which discriminates against him, and in favor of his local competitors with respect to sales to California residents.

It is concluded that the discriminatory imposition of a liability to collect the California use tax unwarrantedly burdens the right of the out-of-state retailer to do business with residents of California.

*Equal Protection*

There is an inherent discrimination in a system which imposes a duty to collect on out-of-state stores of multistate retailers, but not on out-of-state stores of local merchants.[9] The board attempts to justify this discrimination on

---

[9]The stipulation reads: ''Some of plaintiff's competitors in Reno and Klamath Falls have no business location in California. Defendant does not require these stores to collect the use tax from California residents making purchases in these stores, nor does it attempt to collect the use tax from the residents themselves when they reenter California . . . . Defendant does not require plaintiff or any of its competitors to collect a use tax on cash sales made to California residents.''

the ground that the Legislature has power to make reasonable classifications. (See *Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 530 [3 L.Ed.2d 480, 486, 79 S.Ct. 437]; *Walters* v. *City of St. Louis* (1954) 347 U.S. 231, 237 [98 L.Ed. 660, 665, 74 S.Ct. 505]; *Carmichael* v. *Southern Coal Co.* (1937) 301 U.S. 495, 509 [81 L.Ed. 1245, 1253, 57 S.Ct. 868, 109 A.L.R. 1327]; *Southwestern Oil Co.* v. *Texas* (1910) 217 U.S. 114, 121-127 [54 L.Ed. 688, 692-694, 30 S.Ct. 496]; and *Roth Drug, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 732-734 [57 P.2d 1022].) It also contends that the law as administered in connection with the facts of this case does not offend the provisions of article I, section 11 of the State Constitution, which provides: ''All laws of a general nature shall have uniform operation.'' (See *State of California* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 365, 371-372 [310 P.2d 7]; *Sacramento Municipal Utility Dist.* v. *Pacific Gas & Elec. Co.* (1942) 20 Cal.2d 684, 693 [128 P.2d 529].)

The board acknowledges that it cannot reach the solely local out-of-state merchants who sell on credit to California residents, and it urges that this fact—''the impotence of state power'' (see *Wisconsin* v. *J. C. Penney Co., supra,* 311 U.S. 435, 444 [85 L.Ed. 267, 270]; and *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359, 364 [85 L.Ed. 888, 892])—warrants the classification. This argument begs the question. The inability of the state to reach the localized out-of-state merchant suggests, not that there is an inherent power to burden the multiple state merchant for out-of-state transactions which may have some incidental affect on commerce within the state, but that such transactions cannot be burdened unless the connection with the taxing state is such as to give it jurisdiction to tax or regulate the transaction, or the participants, within established constitutional principles.

From the viewpoint of the purchasers there is a definite lack of uniformity because, according to the stipulation, no use tax is ever collected from residents of California who purchase for cash in border towns, or who purchase for credit from merchants who have no business location in California. It is not enough to say that the tax is uniformly administered because a tax is collected on all credit sales to California residents by any out-of-state merchant with a business location in California, if such a classification is unwarranted. Here again, neither the credit customer who actually imports the goods acquired out-of-state to his California resi-

dence, nor the retailer on his behalf, may be in a position to object to the administration of the use tax because there is no vested interest in evading it. (Cf., however, *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 373 [30 L.Ed. 220, 227, 6 S.Ct. 1064] and see *Brock* v. *Superior Court* (1939) 12 Cal.2d 605, 610 [86 P.2d 805].)

That the tax has a discriminatory effect on the out-of-state business of the retailer, or of any other multiple-state merchant under a similar burden, is clear. In *Gowens* v. *City of Bakersfield* (1960) 179 Cal.App.2d 282 [3 Cal.Rptr. 746], the court observed, ". . . the plaintiff is vitally interested in the validity of the ordinance. That it might drive customers away from his business where equally acceptable lodgings are available without tax a short distance away requires no real discussion. A court cannot sit in a vacuum or refuse to recognize the generally known facts of competitive business life." (179 Cal.App.2d at p. 285.) This discrimination has a two-fold effect. In California it purports to extract a higher price of doing intrastate business (the imposition of collection duties and attendant penalties) on those who make fully out-of-state credit sales to its residents, than on those who do not. The discussion attendant to earlier points demonstrates that this classification is constitutionally prohibited when the out-of-state sales are not related in any way to local commerce. In Nevada it imposes burdens on the multi-state merchant which lessen his competitive position. Such discrimination manifests a lack of uniformity which denies equal protection of law. (See *Buencman* v. *City of Santa Barbara* (1937) 8 Cal.2d 405, 415 [65 P.2d 884, 109 A.L.R. 895] ; *Kelly* v. *City of San Diego* (1944) 63 Cal.App.2d 638, 644-645 [147 P.2d 127] ; and *In re Hoskins* (1936) 16 Cal.App.2d 251, 253-254 [60 P.2d 535].) Nor can the discrimination be predicated upon the grounds of administrative convenience. (See *Cumberland Coal Co.* v. *Board* (1931) 284 U.S. 23, 25 [76 L.Ed. 146, 148, 52 S.Ct. 48].) Since the effect of the use tax as administered in this case is to impose upon a retailer a greater burden than is imposed upon those engaged in similar business, the retailer has been denied equal protection and uniform operation of the law as provided in the United States and State Constitutions.

No approval is expressed of the findings of ultimate fact and the conclusions of law insofar as they transcend the

principles set forth in this opinion. Those which are consistent are adequate to sustain the judgment.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied May 29, 1969, and appellant's petition for a hearing by the Supreme Court was denied August 6, 1969. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.