[Sac. No. 5416.   In Bank.   Dec. 15, 1941.]

CHICAGO BRIDGE & IRON COMPANY (a Corporation), Respondent, v. CHARLES G. JOHNSON, as State Treasurer, etc., Appellant.

Earl Warren, Attorney General, H. H. Linney and Adrian A. Kragen, Deputies Attorney General, and F. S. Wahrhaftig for Appellant.

Pillsbury, Madison & Sutro, Devlin & Devlin & Diepenbrock, Chritton, Wiles, Davies, Hirschl & Dawson, S. Nielson and Walker B. Davis for Respondent.

THE COURT.—The controversy presented by this appeal involves the liability of plaintiff for the payment of the use tax levied under the California Use Tax Act of 1935. (Stats. 1935, p. 1297; Deering's Gen. Laws, Act No. 8495a.) Plaintiff paid the tax under protest and then obtained judgment in the court below for the refund thereof; the defendant, Treasurer of the State of California, prosecutes this appeal from that judgment.

Plaintiff is a corporation organized and existing under the laws of Illinois with its principal offices in Chicago, Illinois. It has qualified to do business in California and maintains sales offices and places of business at San Francisco and Los Angeles, California. Plaintiff is primarily a manufacturer of tanks. It purchases the raw material such as steel, outside of California, and manufactures the same into completed tanks at one of its plants, also outside of California. It sells those tanks to its customers in many parts of the United States. The tanks are of such size that they cannot be transported in a single unit, and for that reason, they are shipped "knocked down" and assembled and installed at

their destination. Due to the nature of the business and other factors, the plaintiff finds it necessary in making a sale of a tank to include the assembly of the completed parts and the installation thereof on the customer's premises. As expressed in the stipulation of the parties, "the requirement of each . . . contract (for a tank) that (plaintiff) assemble and install the tank described in that contract . . . was relevant and appropriate to and essentially connected with the subject matter of that contract and inhered, and was properly made to inhere, in the duty of performing the contract." The "knocked down" tanks are shipped in interstate commerce to plaintiff's representatives in California, and are assembled and installed by crews of skilled workmen which plaintiff sends from state to state for that purpose. Under the typical contract between plaintiff and one of its patrons the tanks are to be assembled and attached to the buyer's real property and title to the tank and all parts thereof remain in the plaintiff until the contract price is paid; the last payment on the price is to be made when the tank has been completely installed and tested. The tanks are manufactured by plaintiff pursuant to the special order of plaintiff's customers.

Some of the raw materials purchased by plaintiff for the manufacture of the tanks is purchased for use in the performance of a particular contract or order for a tank and some for stocks maintained at plaintiff's plant for subsequent use in the course of its business operations and for installation at such places as its business may require. The tanks, or rather the completed and component parts thereof, after being shipped to a place at or near where they are to be installed on the customer's premises, are there held by plaintiff for a period of time in the form of tangible personal property, such period being no longer than necessary for the assembly and attachment of the same to the customer's property.

From July 1, 1935, to December 31, 1937, plaintiff was engaged in the performance of contracts for tanks with purchasers in California. Raw materials costing about $161.000 were purchased by plaintiff outside of California expressly for manufacturing tanks to be erected in this state, and materials costing about $70,000, which had likewise been purchased by plaintiff outside this state and were placed in

plaintiff's stock at its plants to be used as its business might require but not intended for use in the performance of any particular contract, were used in the manufacture of tanks at its plants and the "knocked down" tanks shipped to and erected in California in the customary manner. On the basis of those figures the State Board of Equalization determined the tax here involved to be payable by plaintiff.

Plaintiff urges that the judgment here appealed from may be supported on the theories that the Use Tax Act is not by its terms applicable to the tanks under the circumstances here involved and that it is not and cannot constitutionally be made applicable to the storage or use of said tanks in the course of their installation because all such storage or use was in interstate commerce.

In approaching this problem it is first necessary to consider the purpose and object of the use tax. It cannot be doubted that the purpose sought to be accomplished by a statute relating to taxation is important in construing such statute and in determining the scope of its application. (*San Francisco* v. *San Mateo,* 17 Cal. (2d) 814 [112 Pac. (2d) 595].) One of these purposes is to make the coverage of the tax complete to the end that the retail sales tax (Stats. 1933, p. 2599, Deering's Gen. Laws, 1937, Act 8493) will not result in an unfair burden being placed upon the local retailer engaged solely in intrastate commerce as compared with the case where the property is purchased for use or storage in California and is used or stored in this state. The two taxes are complemental to each other with the aim of placing the local retailers and their out-of-state competitors on an equal footing. The fundamental principles to be considered in applying such an act are expressed in the case of *Southern Pacific Company* v. *Gallagher,* 306 U. S. 167, 171 [59 Sup. Ct. 389, 83 L. Ed. 586], as follows:

"The Use Tax Act is complemental to the California Retail Sales Tax Act of 1933. The latter levies a tax upon the gross receipts of California retailers from sales of tangible personal property; the former imposes an excise on the consumer at the same rate for the storage, use or other consumption in the state of such property when purchased from any retailer. As property covered by the sales tax is exempt under the use tax, all tangible personalty sold or utilized in California is taxed once for the support of the state gov-

ernment. Definitions in the Use Tax Act of taxpayer, retailer, storage and use are designed to make the coverage complete. A retailer is 'every person, engaged in the business of making sales for storage, use or other consumption'; use is the exercise of any right or power incident to ownership, except sale in the regular course of business; storage is any 'keeping or retention' with a similar exemption; and a taxpayer includes everyone 'storing, using or otherwise consuming' the property subject to the use tax.''

With these thoughts in mind we turn to the particular case before us. The Use Tax Act provides as follows:

''An excise tax is hereby imposed on the storage, use or other consumption in this State of tangible personal property purchased from a retailer on or after July 1, 1935, for storage, use or other consumption in this State at the rate of three per cent of the sales price of such property.'' (Stats. 1935, p. 1297, sec. 3.) The words used in the clause imposing the tax are defined in the act as follows:

''(a) 'Storage' means and includes any keeping or retention in this State for any purpose except sale in the regular course of business of tangible personal property purchased from a retailer.

''(b) 'Use' means and includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include the sale of that property in the regular course of business.

''(c) 'Purchase' means any transfer, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration. A transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price shall be deemed a purchase. . . .

''(f) 'Retailer' means and includes every person engaged in the business of making sales for storage, use or other consumption; provided, however, that when in the opinion of the board it is necessary for the efficient administration of this act to regard any salesmen, representatives, peddlers or canvassers as the agents of the dealers, distributors, supervisors or employers under whom they operate or from whom they obtain the tangible personal property sold by them, irrespective of whether they are making sales on their own behalf or on behalf of such dealers, distributors, supervisors

or employers, the board may so regard them and may regard the dealers, distributors, supervisors or employers as retailers for purposes of this act.'' The tax imposed in the instant case must necessarily be based upon the storage or use by plaintiff of tangible personal property between the time it arrives in California at the place at or near which it is to be assembled and erected and the completion of the erection and fixation thereof to the real property of the purchaser thereof.

■ It is conceded by defendant before a storage, use or other consumption comes within the terms of the act and is thereby taxable, five conditions must be met: (1) The tangible personal property stored or used must be purchased by the storer or user. (2) The purchase must have been made from a retailer. (3) The purchase must have been made on or after July 1, 1935. (4) The property must have been purchased for use or storage in this state. (5) The property must have been used or stored in this state. There is no question that the second, third and fifth conditions have been satisfied in this case. The retention of the ''knocked down'' tanks in this state pending their installation and the installation thereof would constitute the necessary storage and use. Plaintiff asserts, however, that the tangible personal property (the tanks), the storage or use of which was taxed, was not purchased by it, but on the contrary was manufactured by it. The fallacy of that argument lies chiefly in its inaccurate assumption with respect to the property used or stored and thereby taxed. It is quite true that the tanks, or the completed but unassembled parts, which were shipped to this state were not purchased by the plaintiff in that form; they were manufactured by it. It acquired the raw materials out of which it manufactured or fabricated those completed parts, and it is the storage and use of those materials upon which the tax is based. The tax was computed upon the cost, that is, the sales price of these materials to plaintiff, and that is the price which it paid for them. The fabrication and construction of these materials into the completed articles undoubtedly enhanced their value, but the tax is not calculated on that value. It is based on the sales price to plaintiff of the materials which were used to fabricate the finished product which materials were undeniably purchased by plaintiff. The sales to plain-

tiff of the materials were not made for resale in California; rather they were sold to it to be fabricated by it and stored and used in this state. It was selling the completed tanks erected on the purchaser's premises, not the materials it had purchased for fabrication. It would appear that if the materials were purchased in California and used in a plant maintained here for the manufacture of tanks, the sale of the materials to it would be subject to the California sales tax. If the complete coverage and complementary nature of the sales tax and the use tax are to be preserved, it must be true that the materials are subject to the use tax when purchased and fabricated elsewhere even though their form may be altered by the reason of the fabrication.

It cannot be doubted that those materials which were purchased by plaintiff to fabricate tanks specifically to fulfill contracts or orders for tanks in California, were purchased for use, storage or other consumption in this state. Those materials were designed for the purpose of being used by plaintiff to erect tanks on its customer's premises in California in compliance with its contractual obligation. To say that in ascertaining whether the tax applies, one may not look through the fabrication or manufacture to the purchase of materials used in that process and conclude that such purchase was for storage or use in California, is to sacrifice substance for form. The true reason and purpose for purchasing the materials was not merely the fabrication thereof into tanks. Plaintiff did not intend to stop there. It purchased those materials for use and did use them in this state.

In regard to the portion of materials purchased by plaintiff and retained as stock in its plants outside this state to be used in the construction of tanks as its business might require, it is clear that in order that the object and purpose of the Use Tax Act may not be frustrated, it must be concluded that they were subject to the use tax. Those materials were purchased for use, storage or other consumption in this state. While it is true that they were not acquired with the express purpose of performing any specified contract or order, plaintiff was engaged in the business of selling and constructing tanks in California. In the course of its business those materials might be used in California or elsewhere. It cannot be said therefore that they were not purchased for use here. They were purchased for use in California if and

when the business required their use here to fill an order. The requirement arose and they were used in this state. It follows that those particular materials were purchased for use in California. The materials being used here following the intent to use them here upon a certain contingency, it objectively follows that they were acquired for use here.

We conclude therefore that the materials were purchased for use in California, and were stored by plaintiff when they were in this state on or near the customer's premises awaiting installation, and were used by plaintiff here while they were being installed in the tanks erected for said customers.

Plaintiff also urges in support of the judgment that the Use Tax Act cannot apply to the property here involved because the storage and use thereof is in interstate commerce, that is, so to apply the act would be in violation of the interstate commerce clause of the Constitution of the United States. (U. S. Const., art. I, sec. 8.) And further that the act itself exempts ''Property, the storage, use or other consumption of which this State is prohibited from taxing under the Constitution or laws of the United States of America. . . . '' (Stats. 1935, p. 1297, sec. 4.) Those propositions will not support the judgment. The use tax as applied to plaintiff does not impose a prohibited regulation or burden upon interstate commerce. The cases of *Southern Pacific Co.* v. *Gallagher, supra,* and *Pacific Tel. & Tel. Co.* v. *Gallagher,* 306 U. S. 182 [59 Sup. Ct. 396, 83 L. Ed. 595], are decisive of the question. In the first Gallagher case above-cited, the tangible personal property, the storage and use of which was held subject to the Use Tax Act, included materials for repairs and replacement of the tracks on railroad lines in this state which lines carried the company's interstate business, and office equipment used in its interstate activities; the materials were purchased outside this state by the company for that use in this state and were shipped here. The storage was ''merely incidental to protection until use, as office supplies in a closet or an extra frog at a section tool house.'' ''To avoid delay and cost the movement from loading to final placement is as nearly continuous as managerial efficiency can contrive.'' ''All purchases may be said to be dedicated to consumption in the interstate transportation business'' of the company. ''Subsequent to repairing and reconditioning, rolling stock moves again in interstate

transportation, as do cars after being stocked with supplies.'' The Supreme Court of the United States, after stating the rules that, ''The principle illustrated in the Helson case (*Helson & Randolph* v. *Kentucky,* 279 U. S. 245 [49 Sup. Ct. 279, 73 L. Ed. 683]) forbids a tax upon commerce or consumption in commerce. The Wallace case (*Nashville, C. & St. L. Ry. Co.* v. *Wallace,* 288 U. S. 249 [53 Sup. Ct. 345, 77 L. Ed. 730]), and precedents analogous to it, permit state taxation of events preliminary to interstate commerce,'' holds the use tax as applied to the storage and use of such railroad supplies and equipment valid in the following language, at page 176:

''In the present case some of the articles were *ordered out of the state under specification suitable only for utilization in the transportation facilities and installed immediately on arrival at the California destination.* If articles so handled are deemed to have reached the *end of their interstate transit* upon 'use or storage,' no further inquiry is necessary as to the rest of the articles which are subjected to a retention, by comparison, farther removed from interstate commerce. We think *there was a taxable moment when the former* had reached the end of their interstate transportation and had not *begun to be consumed in interstate operation.* At that moment, the tax on storage and use—retention and exercise of a right of ownership, respectively—was effective. The interstate movement was complete. The interstate consumption had not begun.'' (Emphasis added.) *Pacific Tel. & Tel. Co.* v. *Gallagher, supra,* is to the same effect.

In the instant case the tax was levied on the storage and use of materials which were purchased and fabricated into the tank parts, that storage and use consisting of the time after the materials had arrived and while they were awaiting assembly and erection by plaintiff, and the subsequent installation and erection thereof. The interstate transit had ended when the tank parts arrived at their destination near and/or adjoining the customer's premises and awaited assembly insofar as their being subject to the tax was concerned. That was the commencement of the taxable moment; that was the taxable intrastate event which occurred after the interstate transit had ceased.

Plaintiff endeavors to distinguish the Gallagher cases on several grounds. It asserts that in those cases the purchaser installed the equipment for itself, not as a part of a transac-

tion with another as in the case at bar. But as we have pointed out the plaintiff did install the equipment for itself, that is, the erection of the tank which was in compliance with its contractual obligation so to do. We see no valid distinction between the case at bar and the Gallagher cases where the installation by the Southern Pacific Company of the equipment was made immediately upon its arrival in interstate commerce and immediately upon such installation was used in its interstate activities. Nor does the claim that there were two transactions in the Gallagher cases, namely, the shipment in interstate commerce of the equipment into California followed by its installation and consumption in interstate commerce, while in the case at bar there is only one continuous transaction, namely, the fulfillment of an order for a tank including its final erection. The interstate shipment had come to an end no less in the case at bar than it had in the Gallagher cases. While it is true that it was stipulated that the requirement in plaintiff's contracts for tanks that they be assembled and installed was essentially connected with the contract and inhered in it, the purchase out of California and the shipment here of equipment and the consumption thereof in interstate commerce in the Gallagher cases was no less a continuing and closely integrated operation. The consumption of the equipment in interstate commerce was an essential and necessary part of and inhered in the entire transaction. The whole plan of the shipment of the equipment was that it be immediately consumed in interstate commerce. No shipment would have been made unless it was to be used in interstate commerce.

Even if it be said that the tax here may have affected some event in interstate commerce, it still would not be prohibited by the commerce clause of the Constitution of the United States. The basic reasoning with respect to the conflict between state taxation and that clause is developed in *McGoldrick* v. *Berwind-White Coal Min. Co.*, 309 U. S. 33 [60 Sup. Ct. 388, 84 L. Ed. 565, 128 A. L. R. 876]. The fundamental test is whether there has been in reality an interference with interstate commerce. In the McGoldrick case a sales tax was imposed upon a buyer for consumption of personal property in the State of New York; the seller was obligated to collect the tax from the buyer and to pay it if the latter failed to ·do so. The particular transaction in-

volved was one in which a corporation outside of New York filled an order for coal in New York. The court⋅stated at page 45:

"In imposing taxes for state purposes a state is not exercising any power which the Constitution has conferred upon Congress. It is only when the tax operates to *regulate commerce* between the states or with foreign nations to an extent which infringes the authority conferred upon Congress, that the tax can be said to exceed constitutional limitations. . . . Forms of state taxation whose tendency is to prohibit the commerce or place it at a disadvantage as compared or in competition with intrastate commerce and any state tax which discriminates against the commerce, are familiar examples of the exercise of state taxing power in an unconstitutional manner, because of its obvious regulatory effect upon commerce between the states.

"But *it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business (Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250, 254, 82 L. Ed. 823, 58 Sup. Ct. 546, 115 A. L. R. 944). *Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress.* A tax may be levied on net income wholly derived from interstate commerce. Non-discriminatory taxation of the instrumentalities of interstate commerce is not prohibited. The like. taxation of property, shipped interstate, before its movement begins, or after it ends, is not a forbidden regulation. An excise for the warehousing of merchandise preparatory to its interstate shipment or upon its use, or withdrawal for use, by the consignee after the interstate journey has ended is not precluded. Nor is taxation of a local business or occupation which is separate and distinct from the transportation or intercourse which is interstate commerce, forbidden merely because in the ordinary course such transportation or intercourse is induced or occasioned by such business, or is prerequisite to it. *Western*

*Live Stock* v. *Bureau, supra,* 253, and cases cited.'' (Emphasis added.) And again at page 49:

''If, as guides to decision we look to the *purpose of the commerce clause to protect interstate commerce from discriminatory or destructive state action,* and at the same time to the purpose of the *state taxing power under which interstate commerce admittedly must bear its fair share of state tax burdens,* and to the necessity of judicial reconciliation of these competing demands, we can find no adequate ground for saying that the present tax is a regulation which, in the absence of Congressional action, the commerce clause forbids. This Court has uniformly sustained a tax imposed by the state of the buyer upon a sale of goods, in several instances in the 'original package,' effected by delivery to the purchaser upon arrival at destination after an interstate journey, both when the local seller has purchased the goods extra-state for the purpose of resale, *Woodruff* v. *Parham* [8 Wall. 123, 19 L. Ed. 382], *supra; Hinson* v. *Lott,* 8 Wall. 148, 19 L. Ed. 387; *Banker Bros. Co.* v. *Pennsylvania* [222 U. S. 210, 56 L. Ed. 168, 32 Sup. Ct. 38], *supra; Wiloil Corp.* v. *Pennsylvania* (294 U. S. 169, 79 L. Ed. 838, 55 Sup. Ct. 358], *supra; Graybar Electric Co.* v. *Curry,* 308 U. S. 513 [60 Sup. Ct. 139, 84 L. Ed. 437]; 238 Ala. 116, 189 So. 186, November 6, 1939, and when the extrastate seller has shipped them into the taxing state for sale there. *Hinson* v. *Lott, supra; Sonneborn Bros.* v. *Cureton,* 262 U. S. 506, 67 L. Ed. 1095, 43 Sup. Ct. 643. It has likewise sustained a fixed-sum license tax imposed on the agent of the interstate seller for the privilege of selling merchandise brought into the taxing state for the purpose of sale.'' And in regard to the delivery of the coal to the buyer pursuant to the order therefor as being an inseparable part of the interstate transaction (similar to plaintiff's contention that the retention of the tanks after arrival and the installation thereof was an integral and indispensable part of its contract to supply the tank), the court said at page 53:

''Respondent, pointing to the course of its business and to its contracts which contemplate the shipment of the coal interstate upon orders of the New York customers, insists that a distinction is to be taken between a tax laid on sales made, without previous contract, after the merchandise has crossed the state boundary, and sales, the contracts for

which when made contemplate or require the transportation of merchandise interstate to the taxing state. Only the sales in the state of destination in the latter class of cases, it is said, are protected from taxation by the commerce clause, a qualification which respondent concedes is a salutary limitation upon the reach of the clause since its use is thus precluded as a means of avoiding state taxation of merchandise transported to the state in advance of the purchase order or contract of sale. .

"But we think this distinction is without the support of reason or authority. A very large part, if not most of the merchandise sold in New York City, is shipped interstate to that market. In the case of products like cotton, citrus fruits and coal, not to mention many others which are consumed there in vast quantities, all have crossed the state line to seek a market, whether in fulfillment of a contract or not. That is equally the case with other goods sent from without the state to the New York market, whether they are brought into competition with like goods produced within the state or not. We are unable to say that the present tax, laid generally upon all sales to consumers within the state, subjects the commerce involved where the goods sold are brought from other states, to any greater burden or affects it more, in any economic or practical way, whether the purchase order or contract precedes or follows the interstate shipment. Since the tax applies only if a sale is made, and in either case the object of interstate shipment is a sale at destination, the deterrent effect of the tax would seem to be the same on both. Restriction of the scope of the commerce clause so as to prevent recourse to it as a means of curtailing state taxing power seems as salutary in the one case as in the other.

"True, the distinction has the support of a statement *obiter* in *Sonneborn Bros.* v. *Cureton, supra,* 515, and seems to have been tacitly recognized in *Ware & Leland* v. *Mobile County,* 209 U. S. 405, 412, 52 L. Ed. 855, 859, 28 Sup. Ct. 526, 14 Ann. Cas. 1031, and *Banker Bros. Co.* v. *Pennsylvania, supra,* although in each case a tax on the sale of goods brought into the state for sale was upheld. But we have sustained the tax where the course of business and the agreement for sale plainly contemplated the shipment interstate in fulfilment of the contract. *Wiloil Corporation* v. *Pennsylvania, supra,* 173; *Graybar Electric Co.* v. *Curry, supra.* In the same cir-

cumstances the Court has upheld a property tax on the merchandise transported, *American Steel & Wire Co.* v. *Speed, supra; General Oil Co.* v. *Crain* [209 U. S. 211, 52 L. Ed. 754, 28 Sup. Ct. 475], *supra;* see *Bacon* v. *Illinois, supra* [227 U. S. 515, 516, 57 L. Ed. 620, 33 Sup. Ct. 299] ; upon its use, *Monamotor Oil Co.* v. *Johnson* [292 U. S. 86, 78 L. Ed. 1141, 54 Sup. Ct. 575], *supra; Felt & Tarrant Co.* v. *Gallagher* [306 U. S. 62, 83 L. Ed. 488, 59 Sup. Ct. 376], *supra,* and upon its storage; cf. *Gregg Dyeing Co.* v. *Query* [286 U. S. 472, 76 L. Ed. 1232, 52 Sup. Ct. 631, 84 A. L. R. 831], *supra; Nashville, C. & St. L. Ry. Co.* v. *Wallace* [288 U. S. 249, 77 L. Ed. 730, 53 Sup. Ct. 345, 87 A. L. R. 1191], *supra.* Taxation of property or the exercise of a power over it immediately preceding its previously contemplated shipment interstate has been similarly sustained. *Coe* v. *Errol* [116 U. S. 517, 29 L. Ed. 715, 6 Sup. Ct. 475], *supra; Bacon* v. *Illinois* [227 U. S. 504, 57 L. Ed. 615, 33 Sup. Ct. 299], *supra; Federal Compress & Warehouse Co.* v. *McLean,* 291 U. S. 17 [78 L. Ed. 622, 54 Sup. Ct. 267]. For reasons already indicated all such taxes upon property or the exercise of the powers of ownership stand in no different relation to interstate commerce and have no different effect upon it than has the present sales tax upon goods whose shipment interstate into the taxing state was contemplated when the contract was entered into.''

While the facts in the McGoldrick case may be distinguished from the case at bar the principles there enumerated are clearly applicable. The tax as applied in the instant case does not discriminate against interstate commerce, or constitute a prohibited regulation or interference therewith. As we have seen it is complemental to the sales tax, and the two give a complete, uniform and equal coverage which, rather than discriminating against interstate commerce, endeavors to place intrastate commerce on a fair and equal basis therewith. The tax is not a regulation of interstate commerce although it may incidentally affect it. It is merely a tax on an event occurring in this state which does not burden interstate commerce nor place it at a disadvantage.

Plaintiff cites cases dealing with the general subject of the tests applicable to a determination of the existence of interstate commerce. It would serve no useful purpose to discuss them inasmuch as we are convinced that the most

recent expressions of the Supreme Court of the United States as evidenced by the above-cited cases are conclusive on the issue.

The judgment is reversed.