[S.F. No. 23295. In Bank. Apr. 1, 1976.]

NATIONAL GEOGRAPHIC SOCIETY, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

638

**Counsel**

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Philip M. Plant, Deputy Attorney General, for Defendant and Appellant.

Hanson, O'Brien, Birney, Stickle & Butler, Arthur B. Hanson, Broad, Khourie & Schulz and Michael N. Khourie for Plaintiff and Respondent.

## OPINION

SULLIVAN, J.—Defendant Board of Equalization of the State of California (Board) appeals from a judgment entered in favor of plaintiff National Geographic Society (Society) ordering that defendant refund certain use taxes to plaintiff. Essentially our task is to decide whether the activities of the Society in California constitute a sufficient nexus between this state and the Society so as to justify against constitutional attack the imposition of a use tax collection liability in respect to certain merchandise purchased by California residents by mail orders to the Society's out-of-state offices.

The case was tried by the court, sitting without a jury, and upon a written stipulation of facts. In words and substance the pertinent facts are as follows. The Society is a nonprofit scientific and educational organization incorporated in 1888 under the laws of the District of Columbia with its administrative offices located in Washington, D.C. It is exempted from the payment of federal income taxes.[1] The stated objective of the Society is "the increase and diffusion of geographic knowledge." It supports exploration and research projects dedicated to increasing man's knowledge of the earth, sea, sky and universe. The scientific and educational information obtained is made available to the members and subscribers through the National Geographic Magazine (hereinafter the "Magazine") and offerings of maps, atlases, globes, books, school bulletins, television programs and research reports.

The Magazine, the official journal of the Society, is furnished only to members of the Society except for subscribing schools, libraries, book dealers and corporations.[2] Membership is open to all persons; the majority of members join in order to obtain the Magazine. They pay $7.50 a year for membership for which they receive one year's subscription to the Magazine.[3] As of June 1972 there were approximately

---

[1] Under 26 United States Code section 501 (c) (3), as amended. (Internal Rev. Code.)

[2] These represent less than 5 percent of total circulation.

[3] Nonmember subscribers such as schools, libraries, bookdealers and corporations pay $9 a year.

872,000 member subscriptions and 21,000 nonmember subscriptions in California. The Magazine is exempted from California sales and use taxes as a "periodical" under Revenue and Taxation Code section 6362.[4]

The Society advertised offerings of maps, atlases, globes and books in the Magazine and by announcements mailed to members and subscribers during all periods relevant hereto. To take advantage of these offerings, an order form enclosed with the mail announcements or an order coupon in the Magazine is removed, completed and mailed to the administrative offices of the Society in Washington, D.C. Deliveries of such publications are made through the mail either directly from the Society's Washington and/or Maryland offices. Payment for the merchandise ordered is either cash with order or by a mailed billing following the purchaser's receipt of the merchandise. Finally, a small volume of merchandise is sold directly over the counter in the Washington, D.C. offices. Although these offerings of maps, atlases, globes and books are made only in the Magazine and in mail announcements, anyone who removes an order coupon from the Magazine may order and receive such merchandise.

Since 1956, the Society has maintained two offices in California—one in San Francisco and one in Los Angeles. During the tax periods in controversy, there were two employees in each office; later, there were four in each office. During the period from August 1, 1963, through May 6, 1964, these two offices sold maps, atlases, globes and books, of the type described above as mail order merchandise, over the counter to any individual requesting them.[5] At all other times, these offices made no sales and confined their activities to the solicitation of advertising for the Magazine.

During the period from April 1, 1964, to September 30, 1964, the Society made sales of maps, atlases, globes and books to California residents in the sum of $85,596.48 through mail orders. The Board notified the Society that it was obligated, under section 6203, to collect the use taxes on this merchandise and that since it had not done so, it was

---

[4]Hereafter, unless otherwise indicated, all section references are to the Revenue and Taxation Code.

[5]The over-the-counter sales had a total value of $2,841.05. The value of the merchandise sold to California residents by mail order during the same period was $452,470. The Society paid state and local sales taxes, plus penalties and interest upon sales totalling $546.20 during the period April 1, 1964, to May 6, 1964. It seeks no refund of this amount.

liable for an equivalent amount under section 6204. The Society paid the assessment for the above two quarters of 1964 under protest and brought this action for a refund. The total state and local use tax collection liability with interest and penalties was the sum of $3,838.76.[6]

The use tax is a natural companion to the sales tax since it is complementary to the latter. (*Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340, 343 [98 L.Ed. 744, 747, 74 S.Ct. 535]; *Nelson* v. *Sears Roebuck & Co.* (1941) 312 U.S. 359, 361 [85 L.Ed. 888, 890, 61 S.Ct. 586, 132 A.L.R. 475]; *Chicago Bridge & Iron Co.* v. *Johnson* (1941) 19 Cal.2d 162, 165-166 [119 P.2d 945], quoting from *Southern Pac. Co.* v. *Gallagher* (1939) 306 U.S. 167, 171 [83 L.Ed. 586, 589-591, 59 S.Ct. 389].) "The use tax . . . usually appears as a support to the sales tax in two respects. One is protection of the state's revenues by taking away from inhabitants the advantages of resort to untaxed out-of-state purchases. The other is protection of local merchants against out-of-state competition from those who may be enabled by lower tax burdens to offer lower prices." (*Miller Bros. Co.* v. *Maryland, supra,* 347 U.S. at p. 343 [98 L.Ed. at p. 747].) It is well settled that a state may constitutionally impose directly upon resident purchasers a tax for the privilege of using goods within the state. "The validity of such a tax, so far as the purchaser is concerned, 'has been withdrawn from the arena of debate.' (*Nelson* v. *Sears Roebuck & Co., supra,* 312 U.S. 359, 363 [85 L.Ed. 888, 891].) The constitutionality of California's exaction of the tax has been clearly upheld. (*Union Oil Co.* v. *State Bd. of Equal.* (1963) 60 Cal.2d 441, 457-459 [34 Cal.Rptr. 872, 386 P.2d 496]; app. dism., 377 U.S. 404 [12 L.Ed.2d 495, 84 S.Ct. 1629].)

However, the collection of the use tax directly from each resident purchaser has presented a difficult, if not insuperable, administrative problem for the taxing state. As a consequence, many states have sought to impose upon an out-of-state seller liability to collect a local use tax (see *Nat. Bellas Hess* v. *Dept. of Revenue* (1967) 386 U.S. 753, 757 [18

---

[6]Although it is not in the stipulated facts, documents in the record and the briefs on appeal reveal that the total asserted tax liability exceeds $180,000 and covers a period of nine years. The Board agreed to postpone collection of the remainder until this action determined the constitutionality of the asserted liability.

The Society paid the taxes for the two consecutive quarters covering April 1, 1964, to June 30, 1964, and July 1, 1964, to September 30, 1964. These periods were chosen to represent the two different degrees of in-state activity (i.e. with and without the over-the-counter sales of the mail order merchandise.) Since we hold that the collection liability may be imposed without *any* over-the-counter sales, we do not consider these sales further.

L.Ed.2d 505, 509, 87 S.Ct. 1389]). California has met the problem in the same way. The use tax in this state is an excise tax "on the storage, use, or other consumption in this state of tangible personal property purchased from any retailer . . . for storage, use, or other consumption in this state . . . ." (§ 6201.) "Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. His liability is not extinguished until the tax has been paid to this State . . . ." (§ 6202.) Section 6203 requires "every retailer engaged in business in this state and making sales of tangible personal property for storage, use, or other consumption in this state" to collect the tax from the purchaser. A "retailer engaged in business in this state" is defined in section 6203 and includes "[a]ny retailer maintaining, occupying, or using, permanently or temporarily, directly or indirectly, or through a subsidiary, or agent, by whatever name called, an office, place of distribution, sales or sample room or place, warehouse or storage place or other place of business." Section 6204 provides that the tax required to be collected by the retailer constitutes a debt owed by the retailer to the state.

It is the position of the Board that since the Society maintains an "office" or "other place of business" within California—namely its two offices from which it solicits advertising for the Magazine—it falls within section 6203 and has the duty of collecting use taxes on goods sold through mail orders to California residents. It is the position of the Society, on the other hand, that the imposition of a use tax collection liability under such circumstances is in violation of the due process clause of the Fourteenth Amendment to, and of the commerce clause (art. I, § 8, cl. 3) of, the United States Constitution.

The criteria for determining the validity of such liability in the light of the above two-pronged constitutional attack were set forth in *Nat. Bellas Hess* v. *Dept. of Revenue, supra,* 386 U.S. 753, 756-757 [18 L.Ed.2d 505, 508-509]: "These two claims are closely related. For the test whether a particular state exaction is such as to invade the exclusive authority of Congress to regulate trade between the States, and the test for a State's compliance with the requirements of due process in this area are similar. See *Central R. Co.* v. *Pennsylvania,* 370 U.S. 607, 621-622 (concurring opinion of MR. JUSTICE BLACK). As to the former, the Court has held that 'State taxation falling on interstate commerce . . . can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys.' *Freeman* v. *Hewit,* 329 U.S. 249, 253. See also *Greyhound Lines* v. *Mealey,* 334 U.S. 653, 663;

*Northwestern Cement Co.* v. *Minnesota,* 358 U.S. 450, 462. And in determining whether a state tax falls within the confines of the Due Process Clause, the Court has said that the 'simple but controlling question is whether the state has given anything for which it can ask return.' *Wisconsin* v. *J.C. Penney Co.,* 311 U.S. 435, 444. See also *Standard Oil Co.* v. *Peck,* 342 U.S. 382; *Ott* v. *Mississippi Barge Line,* 336 U.S. 169, 174. The same principles have been held applicable in determining the power of a State to impose the burdens of collecting use taxes upon interstate sales. Here, too, the Constitution requires 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' *Miller Bros. Co.* v. *Maryland,* 347 U.S. 340, 344-345; *Scripto, Inc.* v. *Carson,* 362 U.S. 207, 210-211. [Fn. omitted.] See also *American Oil Co.* v. *Neill,* 380 U.S. 451, 458." More recently in a case involving a business and occupation tax levied on the unapportioned gross receipts from sales, the high court again quoting the same language from *Wisconsin* v. *J.C. Penney Co., supra,* 311 U.S. 435, 444 [85 L.Ed. 267, 270, 61 S.Ct. 246, 130 A.L.R. 1229], pointedly declared that "the question is 'whether the state has given anything for which it can ask return.' " (*Standard Steel Co.* v. *Wash. Revenue Dept.* (1975) 419 U.S. 560, 562 [42 L.Ed.2d 719, 722, 95 S.Ct. 706].)

It is clear that where the out-of-state mail order seller's connection with the taxing state is *solely* by instruments of interstate commerce—e.g., by common carrier or the United States mail—the state has given nothing for which it can ask return. Indeed in *Nat. Bellas Hess,* the Supreme Court took pains to point out that it "has never held that a State may impose the duty of use tax collection and payment" under such circumstances. (386 U.S. at p. 758 [18 L.Ed.2d at p. 509].) Accordingly it held that Illinois could not constitutionally impose a use tax collection liability upon a mail order house whose principal place of business was in Missouri and whose only contacts with Illinois were by United States mail or common carrier since in the circumstances of that case it would amount to a tax on the privilege of doing interstate business and would be violative of the commerce clause.

Where, on the other hand, the out-of-state mail order seller, although effecting its sales through instruments of interstate commerce, has retail outlets in the taxing state albeit the mail orders were neither solicited nor placed by any of its agents therein (*Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359), or has local retail outlets and in addition has solicited the mail order sales through local advertisement but not by local agents (*Nelson* v. *Montgomery Ward* (1941) 312 U.S. 373 [85 L.Ed.

897, 61 S.Ct. 593]) or, having no local office or place of business, nevertheless has solicited the mail order sales by its travelling salesmen sent into the taxing state (*General Trading Co.* v. *Tax Comm'n* (1944) 322 U.S. 335 [88 L.Ed. 1309, 64 S.Ct. 1028]) or has solicited them only through local brokers, wholesalers or jobbers compensated on a commission basis (*Scripto* v. *Carson, supra,* 362 U.S. 207 [4 L.Ed.2d 660, 80 S.Ct. 619]), the use tax collection liability has been upheld. On this crucial issue of jurisdiction to tax, we think the most recent ruling in the *Standard Steel* case, although involving a business and occupation tax, is not only germane but highly significant. There the court declared that it "verges on the frivolous" to contend that the state had not given anything for which it could ask return where the only connection of the out-of-state seller with the taxing state, other than through instruments of interstate commerce, was the presence therein of one full time engineer who advised the seller's purchaser with regard to its needs for a certain product ordered directly by mail to the seller and shipped directly to the purchaser by common carrier. (*Standard Steel Co.* v. *Wash. Revenue Dept., supra,* 419 U.S. 560.)

█ We are satisfied that from the above cited decisions the following principle can be distilled and we thus hold: Where an out-of-state seller conducts a substantial mail order business with residents of a state imposing a use tax on such purchasers and the seller's connection with the taxing state is *not* exclusively by means of the instruments of interstate commerce, the slightest presence within such taxing state independent of any connection through interstate commerce will permit the state constitutionally to impose on the seller the duty of collecting the use tax from such mail order purchasers and the liability for failure to do so.

█ In the instant case, the Society conducts a widespread business with California residents. As of June 1972, it had 872,000 "members" in California who subscribed to its Magazine; additionally it received 21,000 nonmember subscriptions in California. During one nine-month period its mail order sales of maps, atlases, globes and books (exclusive of the Magazine) to California residents amounted to $452,470. There can be no question as to the Society's presence in California independent of any connection with this state through interstate commerce. It maintained in this state two offices from which employees solicited advertising for the Magazine; clearly these offices provided sufficient activities within California, receiving from this state protection and benefits "for which it can ask return." (*Wisconsin* v. *J.C. Penney Co.,*

*supra,* 311 U.S. 435, 444 [85 L.Ed. 267, 270-271].) Indeed the Society concedes that it has never been its position in this case that the tax did not apply because of the insubstantiality of the Society's activities in California. In light of the cases and principle set forth above, California had the jurisdiction to impose on the Society a use tax collection liability in respect to its mail order sales to California residents of the articles referred to.

It is this conclusion which is the target of the Society's constitutional attack. The Society contends that its activities in California are so "dissociated" from the mail order activities sought to be taxed that there is "no justiciable relationship between the two." These in-state activities —namely the solicitation of advertising for the Magazine—bear no relation whatsoever to the mail order sales of goods; the solicitation of advertisements neither informs the subscribers of the goods in question nor induces them to purchase the goods.[7]

Our attention has not been directed to, nor have we found, any controlling appellate decision holding in circumstances reasonably approximating those of the case at bench that the imposition of a use tax collection liability on a mail order seller is constitutionally impermissible under the due process clause or the commerce clause of the United States Constitution because the in-state activities of such seller are "dissociated" from its mail order activities. Such a thesis, we think, would cut across the doctrinal principles running through the fabric of authorities discussed in the first part of this opinion. More particularly, it must collapse under the rationale and holding of *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359.

---

[7]The Society also contends that the in-state activities of the Magazine cannot be used to determine whether there is a nexus sufficient to allow the imposition of the collection obligation. This argument is based upon misinterpretation of the tax exemption for periodicals, such as the Magazine provided in section 6362 of the Revenue and Taxation Code.

The existence of a nexus to tax an interstate transaction is a constitutional question. The only relevant considerations are the contacts between the taxing state and the person and event to be taxed. The fact that a state chooses not to tax when it could constitutionally do so does not in any way reduce these contacts with the state. The manner in which the state chooses to exercise the power does not affect the existence of the power.

Section 6362 exempts periodicals and any tangible personal property which becomes an ingredient or component part of a periodical. The statute does not in any way exempt the presence of the Society in the state when it is related to the Magazine. The statute cannot be construed to prevent the tax obligation the state seeks to impose here.

In *Sears, Roebuck,* the taxpayer, a New York corporation, had retail stores in Iowa and in addition conducted a mail order business directly between customers in Iowa and the taxpayer's mail order houses located outside Iowa. Sears, Roebuck contended, and the Iowa Supreme Court held, that these mail order sales were "separate and distinct" from the taxpayer's activities in Iowa. The state court concluded that although the use tax was on the purchaser nevertheless since it had to be collected when the sale was made and the property was outside the state, Iowa lacked the power to regulate such activities and its imposition of use tax collection liability was unconstitutional. The Supreme Court rejected this argument of "dissociation" and reversing, upheld the use tax collection liability as constitutional. We quote somewhat at length from the opinion of Mr. Justice Douglas for the court because it at once resolves the central constitutional argument before us and answers the cluster of arguments presented by the Society to support its claim of dissociation: "The fact that under Iowa law the sale is made outside of the state does not mean that the power of Iowa 'has nothing on which to operate.' *Wisconsin v. J.C. Penney Co., supra,* [311 U.S. 435]. The purchaser is in Iowa and the tax is upon use in Iowa. The validity of such a tax, so far as the purchaser is concerned, 'has been withdrawn from the arena of debate.' *Henneford* v. *Silas Mason Co.,* 300 U.S. 577, 583; *Southern Pacific Co.* v. *Gallagher, supra,* [306 U.S. 167 (83 L.Ed. 586, 59 S.Ct. 389)]. It is one of the well-known functions 'of the integrated use and sales tax to remove the buyers' temptation 'to place their orders in other states in the effort to escape payment of the tax on local sales.' *Henneford* v. *Silas Mason Co., supra,* p. 581. As pointed out in that case (p. 582), the fact that the buyer employs agencies of interstate commerce in order to effectuate his purchase is not material, since the tax is 'upon the privilege of use after commerce is at an end.' . . .

"So the nub of the present controversy centers on the use of respondent as the collection agent for Iowa. The imposition of such a duty, however, was held not to be an unconstitutional burden on a foreign corporation in *Monamotor Oil Co.* v. *Johnson,* 292 U.S. 86, and *Felt & Tarrant Mfg. Co.* v. *Gallagher,* 306 U.S. 62. But respondent insists that those cases involved local activity by the foreign corporation as a result of which property was sold to its local customers, while in the instant case there is no local activity by respondent which generates or which relates to the mail orders here involved. Yet these orders are still a part of respondent's Iowa business. The fact that respondent could not be reached for the tax if it were not qualified to do business in Iowa would merely be a result of the 'impotence of state power.' *Wisconsin* v. *J.C.*

*Penney Co., supra.* Since Iowa has extended to it that privilege, Iowa can exact this burden as a price of enjoying the full benefits flowing from its Iowa business. Cf. *Wisconsin* v. *J.C. Penney Co., supra.* Respondent cannot avoid that burden though its business is departmentalized. Whatever may be the inspiration for these mail orders, however they may be filled, Iowa may rightly assume that they are not unrelated to respondent's course of business in Iowa. They are nonetheless a part of that business though none of respondent's agents in Iowa actually solicited or placed them. Hence to include them in the global amount of benefits which respondent is receiving from Iowa business is to conform to business facts." (*Sears, Roebuck, supra,* at pp. 363, 364 [85 L.Ed. at pp. 891, 892].)

Like Sears, Roebuck in the cited case, the Society in the instant one is a single business entity conducting its course of business in California. Here, as there, its mail orders are part of its California business. We observe no basic dissimilarity between the Magazine on the one hand and the maps, atlases, globes and books on the other. Both the Magazine and the latter mail order merchandise are ordered, paid for and delivered in essentially the same way. The Magazine and the merchandise are remarkably similar in nature, function and purpose. We can discern no significant difference between a periodical which deals with geography and maps, atlases, globes and books which obviously cover the same field of knowledge. Nor can we detect any fundamental difference in function—both the Magazine and the merchandise make information gathered by the Society available to its members. Overall and common to both is the pervasive purpose of the Society to further "the increase and diffusion of geographic knowledge." The final result of the Society's course of business is the *use* by California residents of all of the above media of knowledge. In short, the mail orders are a part of the Society's business in California. As in *Sears, Roebuck,* the Society cannot avoid its use tax collection liability by claiming that its California business is departmentalized. We reject as of no constitutional relevance its claim that its in-state activities are "dissociated" from its mail order activities.

The Society insists that authoritative support for its claim of dissociation can be found in *American Oil Co.* v. *Neill* (1965) 380 U.S. 451 [14 L.Ed.2d 1, 85 S.Ct. 1130], and *Montgomery Ward & Co.* v. *State Bd. of Equalization* (1969) 272 Cal.App.2d 728 [78 Cal.Rptr. 373]. We disagree. The Society misconstrues the holding of these cases—neither asserts a "dissociation" between the nature of the in-state activities and the nature

of the activities of the business entity sought to be taxed, but rather each holds that there is a defect in the relationship between the state and the event to be taxed.

In *American Oil* American's predecessor in interest, Utah Oil Refining Company, was a Delaware corporation authorized to do business in Idaho. That state imposed an excise tax on all motor fuels received in the state, taxing the dealer as the person first receiving the fuels and also holding him liable as a constructive recipient of fuels sold by him outside the state for in-state use by an unlicensed purchaser. Upon acceptance of bids transmitted from its office in Salt Lake City, Utah Oil sold gasoline to the Atomic Energy Commission (A.E.C.) for delivery in Utah at a designated price f.o.b. Salt Lake City. The A.E.C. then transported the fuel by common carrier, selected and paid by A.E.C., to Idaho where it was stored in A.E.C.-owned tanks. Utah Oil sold the gasoline, knowing it would be imported into and used in Idaho.

The Supreme Court held that Idaho's imposition of the excise tax could not be upheld as against attack under the due process clause: "In the present case it is plain that neither Utah Oil's position as a licensed dealer in Idaho nor the fact that it otherwise engaged in business there will suffice to uphold the tax. Utah Oil's transfer of gasoline was unquestionably an out-of-state sale vis-à-vis Idaho and entirely unconnected with its business in that state. *Each and every phase of the transaction had its locus outside of Idaho. . . .*" (*American Oil Co.* v. *Neill, supra,* 380 U.S. at p. 458 [14 L.Ed.2d at pp. 6-7]; italics added.) The essence of the holding is that the taxed event was the sale of gasoline in Utah and neither (1) Utah Oil's knowledge that the A.E.C. would later import the gasoline into Idaho nor (2) Utah Oil's being licensed as a dealer there was sufficient to bring the transaction within the taxing power of Idaho. As the italicized language, *ante,* makes clear, the sale was beyond the taxing power of Idaho because Utah Oil had nothing to do with the interstate transportation of the gasoline into that state.

This situation is distinguishable from the one at bench where the Society *was* entirely responsible for shipping the mail order merchandise into California for use there by the purchasers, the mail orders being part of the Society's course of business in this state. (*Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359, 364 [85 L.Ed. 888, 892].) *American Oil* is not authority, as the Society would have it, for a "dissociation" between its in-state activities and its mail order activities in a use tax context. The Society ingeniously attempts to make the concept of "dissociation"

employed in sales tax or gross receipts tax cases (see for example, *Norton Co.* v. *Dept. of Revenue* (1951) 340 U.S. 534 [95 L.Ed. 517, 71 S.Ct. 377]) spill over into the use tax field. As the high court made clear in *Norton,* the impact of the use tax "is on the local buyer or user. Cases involving them are not controlling here, for this tax falls on the vendor." (*Id.,* at p. 537 [95 L.Ed. at p. 520], citing inter alia *Nelson* v. *Sears, Roebuck & Co., supra,* 312 U.S. 359, and *Nelson* v. *Montgomery Ward, supra,* 312 U.S. 373.)

Nor does *Montgomery Ward & Co.* v. *State Bd. of Equalization, supra,* 272 Cal.App.2d 728, assist the Society. There the Board attempted to impose a *use* tax collection liability on Montgomery Ward for over-the-counter sales made for cash or credit to California residents at its stores in Oregon and Nevada. In support of the liability, the Board relied on (1) a nexus between the state and the taxpayer by reason of the latter's retail stores in California and (2) the taxpayer's knowledge that the goods would be used in California by reason of the customer's address on his charge account. The use tax collection liability was struck down as violative of the due process, equal protection and commerce clauses of the United States Constitution.

It is noteworthy that the decision did not rest on a lack of nexus between the state and the taxpayer. The presence of retail outlets in California would clearly provide a basis for use tax collection liability in respect to merchandise delivered or mailed directly into California. (*Nelson* v. *Montgomery Ward, supra,* 312 U.S. 373.) The constitutional defect lay in the lack of certainty of the connection between the seller's activities and the event to be taxed, namely the use. In *Nelson* the certainty of use in the taxing state was guaranteed by the seller's own actions, namely mailing the goods directly to the purchaser. However, unless the seller by his own actions makes certain the taxable use, e.g. by sending or delivering the merchandise into the taxing state, he cannot be required to collect the tax.

In *Miller Bros. Co.* v. *Maryland, supra,* 347 U.S. 340, Maryland likewise tried to impose a use tax collection liability on out-of-state over-the-counter sales in Delaware. There the out-of-state seller had no in-state retail stores so that a constitutional problem was presented as to substantiality of contacts between Maryland and the Delaware business entity. The court in denying tax liability noted that no one was liable for a use tax until the merchandise was imported into the taxing state. When there is an over-the-counter out-of-state sale, the taxable event, use

occurs only after the sale is complete; the seller has no control over that use. When discussing *Miller Bros.* in *Scripto* v. *Carson, supra,* 362 U.S. 207, 212 [4 L.Ed.2d 660, 664-665], the Supreme Court declared that "it was impossible for Miller to determine that goods sold for cash to a customer over the counter at its store in Delaware were to be used and enjoyed in Maryland." The use in the taxing state must be certain from the retailer's own actions and not just known to him from other factors. Knowledge is an insufficient connection to uphold a tax against attack under the due process clause. (*American Oil Co.* v. *Neill, supra,* 380 U.S. 451, 457 [14 L.Ed.2d 1, 6].)

The same result was reached on the same facts by the court in *Montgomery Ward & Co.* v. *State Bd. of Equalization, supra,* 272 Cal.App.2d 728: The out-of-state over-the-counter sales for cash or credit cannot support the imposition of a use tax collection obligation on the out-of-state seller on all goods ultimately used in California, except those goods directly delivered into California. In the case at bench, therefore, since the Society sends all its merchandise directly to the resident purchasers in California, *Montgomery Ward* is inapposite.

We conclude that the imposition of use tax collection liability on the Society violates neither the due process clause of the Fourteenth Amendment to the United States Constitution nor the commerce clause of said Constitution.

The judgment is reversed and the cause is remanded to the trial court with directions to enter judgment for defendant Board of Equalization.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.